718 September 11, 2015 No. 35

IN THE SUPREME COURT OF THE
STATE OF OREGON

CITY OF SEATTLE,
a municipal corporation of the State of Washington,
acting by and through its City Light Department,
*Plaintiff-Appellant,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant-Respondent.*

(TC-RD 4946, 4957)

PUBLIC UTILITY DISTRICT NO. 1
OF SNOHOMISH COUNTY, WASHINGTON,
a municipal corporation of the State of Washington,
*Plaintiff-Appellant,*

*v.*

DEPARTMENT OF REVENUE,
State or Oregon,
*Defendant-Respondent.*

(TC-RD 4959)

CITY OF TACOMA,
a municipal corporation of the State of Washington,
acting by and through its Department of Public Utilities,
Light Division, dba Tacoma Power,
*Plaintiff-Appellant,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant-Respondent.*

(TC-RD 4958)

(SC S061813)

En Banc

On appeal from the Oregon Tax Court.*

_____
  * 21 OTR 269 (2013).

Henry C. Breithaupt, Judge.

Argued and submitted November 3, 2014.

Gregory A. Chaimov, Davis Wright Tremaine LLP, Portland, and Gregory C. Narver, Assistant City Attorney, Seattle, Washington, argued the cause and filed the briefs for appellants.

Keith L. Kutler, Assistant Attorney General, Salem, argued the cause for respondent. Melisse S. Cunningham, Senior Assistant Attorney General, filed the brief for respondent. With her on the brief was Ellen F. Rosenblum, Attorney General.

BALDWIN, J.

The decision of the Tax Court is affirmed.

Kistler, J., concurred in part and concurred in the judgment in part and filed an opinion, in which Landau, J., joined

**BALDWIN, J.**

In this appeal from the Oregon Tax Court, appellants are three municipal corporations located in Washington State: The City of Seattle, the City of Tacoma, and Public Utility District No. 1 of Snohomish County (taxpayers). Respondent is the Oregon Department of Revenue (department). Each taxpayer owns an interest in electrical transmission capacity that was purchased from the Bonneville Power Administration (BPA) and is used for transmitting electricity over the Northwest's federally-administered power transmission grid. Together, they appeal from a summary judgment ruling in which the Tax Court, citing *Power Resources Cooperative v. Dept. of Rev.*, 330 Or 24, 996 P2d 969 (2000), concluded that taxpayers' interest in electrical transmission capacity could—because much of that grid is located in Oregon—be taxed by the department as a property interest "held" by taxpayers, under ORS 307.060.

On appeal, taxpayers argue that: (1) *Power Resources* was wrongly decided; (2) this court's decision in *Pacificorp Power Marketing v. Dept. of Rev.*, 340 Or 204, 131 P3d 725 (2006)—holding that contracts between a taxpayer and a municipally-owned electric power plant demonstrated the taxpayer's "use" of the facility for taxation under ORS 308.505 to 308.565—does not apply in this case; and (3) the Oregon legislature's repeal of the 2005 property tax exemption benefitting out-of-state power-generating municipalities was enacted in violation of Article IV, section 18, of the Oregon Constitution, a provision that requires that bills for raising revenue originate in the House of Representatives. For reasons we explain below, we reject taxpayers' arguments and affirm the Tax Court's judgment.

## I. BACKGROUND

Before turning to the pertinent facts in this matter, we provide some necessary background about the relationship between taxpayers, the Pacific Northwest AC Intertie, and our earlier decisions in *Power Resources* and *Pacificorp Power Marketing*. As part of their municipal functions, taxpayers in this case generate and sell electricity to local consumers. They also buy and sell electricity on a wholesale basis, trading with other public and private entities

throughout the western United States. Taxpayers, however, do not own transmission networks of sufficient scope and capacity to transmit that electricity between their various trading partners. Consequently, to commercially transport electric power throughout the region, taxpayers rely on the Pacific Northwest/Pacific Southwest Intertie, a system of power lines and substations that stretches from the state of Washington to southern California.

The Pacific Northwest portion of the Intertie is located primarily in Oregon and is owned by three entities. BPA owns 100 percent of the Pacific Northwest DC Intertie, the part of the system that transmits power only in DC, or direct current. Another part of the system, the Pacific Northwest AC Intertie, transmits only AC, or alternating current. That part of the Intertie is jointly owned by BPA, Portland General Electric Company (PGE), and PacifiCorp. Each of the three owners maintains its own facilities and equipment that collectively make up the regional power grid for commercially transmitting AC electrical power around the Northwest and south to the Oregon/California border.

By the early 1990s, capital improvements to the Pacific Northwest AC Intertie had substantially increased the system's transmission capacity. In response, the federal government gave select nonfederal regional entities that traded electricity on a wholesale basis an opportunity to secure rights to a permanent portion of that system's excess transmission capacity. Eight such utilities—called Capacity Owners—entered into contracts with BPA known as Capacity Ownership Agreements (COAs).

Prior to 1996, those agreements required Capacity Owners to tender an upfront lump sum payment to BPA reflecting that user's estimated pro-rated share of BPA's capital and related costs. A Capacity Owner was also required to pay 21 percent of the system's annual operating and maintenance costs. In return, a Capacity Owner received a life-of-the-facility right to use a specific portion of the system's excess transmission capacity. According to BPA's Record of Decision addressing the actual ownership agreements,[1] the

---

[1] A Record of Decision is a public document setting out a federal agency's decision concerning any proposed action that comes before it.

agency's policy goal in entering into COAs with the utilities was

> "to ensure that potential New Owners had an equitable opportunity to acquire a share of transmission capacity in the Intertie that is as close to full 'ownership' as possible."

In addition to a life-of-the-facility right of use, the Record of Decision regarding each COA also generally provided that Capacity Owners:

- Retained exclusive use of their respective megawatt shares of Intertie capacity;

- Possessed the option to purchase additional capacity when Intertie facilities were upgraded;

- Possessed a one-time opportunity to choose between (1) the right to use Intertie capacity for themselves and to transmit power for third parties, or (2) the right to retain transmission capacity solely for their own use. (Under the actual draft contracts, electing to abstain from third party transmissions expressly authorized BPA to transmit electricity on a capacity owner's unused capacity in exchange for compensation. In practice however, at least two of the parties in this case—the City of Tacoma and Snohomish PUD No. 1—amended their original COAs to allow each of them to transmit for third parties *and* allow BPA to use spare capacity.)

- Could, with BPA consent, sell their capacity rights; and

- Could, without BPA consent, assign their capacity rights as security for financing purposes, or otherwise engage in certain transfers to other new owners and select Pacific Northwest utilities.

In 2000, this court decided *Power Resources*, holding that any taxpayer possessing permanent rights to the Intertie in Oregon "held" a possessory interest in that system that should be included in the assessed value of the taxpayer's property. Six years later, this court decided *Pacificorp Power Marketing*—a utility-related tax matter that did not involve the Intertie—and held that a taxpayer's "use" of a

power facility also could serve as a basis for taxation under Oregon's tax statutes. Combined, those two cases established alternative bases for taxing facilities in Oregon that are used to generate and/or transmit electricity. That kind of property interest ordinarily is subject to Oregon property taxes and is centrally assessed by the department. Central assessments[2] can be based either on a taxpayer's possessory interest in such facilities under *Power Resources* or on the taxpayer's use of such facilities under *Pacificorp Power Marketing*. However, as explained in greater detail below, taxpayers contend that neither of those decisions applies to the circumstances here.

We now turn to the facts of this case. Like the taxpayer in *Power Resources*, taxpayers entered into COAs relating to the Pacific Northwest AC Intertie with BPA in 1994. The parties do not dispute the fact that, except for differences in megawatts of capacity, the material provisions of the COAs at issue here are essentially the same as the provisions of the COA at issue in *Power Resources*.

In 2001, following this court's decision in *Power Resources*, the department levied property taxes on taxpayers based on the assessed value of the Intertie connection that each taxpayer possessed. Taxpayers challenged the department's assessment, but their litigation ended in 2005 when the legislature enacted Oregon Laws 2005, chapter 832, section 1. Taxpayers' controversy ceased to exist because the newly-enacted law expressly exempted foreign municipal corporations like taxpayers from taxation on Intertie-related property rights conferred by COAs.

In 2009, several Oregon legislators, seeking to broaden that exemption to include domestic electric cooperatives, introduced Senate Bill (SB) 495. SB 495 passed the Senate but, when it went through the House, the bill's substantive provisions were removed and replaced with provisions that effectively repealed the tax exemption enacted in 2005.[3] In its altered form, the House passed the bill and

---

[2] Taxes are "centrally assessed" against a taxpayer when property assessments are levied by the department—as opposed to the counties—under ORS 308.505 to 308.665. *See* ORS 308.505(2) (so stating).

[3] In legislative parlance, that process is often referred to as "gut and stuff."

returned it to the Senate, where it also passed. Signed by the Governor in July 2009, the bill was enacted into law as Oregon Laws 2009, chapter 804.

In 2010, with the statutory Intertie tax exemption no longer in place, the department renewed its efforts to tax the value of taxpayers' Intertie transmission rights. Taxpayers responded by again filing actions in the Tax Court challenging those assessments. Among their various claims, taxpayers contended that SB 495—the enactment that had repealed their tax exemptions—was void because it was a bill for raising revenue that had improperly originated in the Senate rather than in the House, as required by Article IV, section 18, of the Oregon Constitution.[4] Taxpayers also contended that their right to access electrical transmission capacity over the Intertie did not constitute a possessory interest in Intertie capacity, facilities, or equipment sufficient to subject them to Oregon tax assessments, notwithstanding this court's contrary decision in *Power Resources*.

In 2011 and 2013, the Tax Court resolved taxpayers' claims in the department's favor in two written opinions arising out of cross-motions for partial summary judgment. *See City of Seattle v. Dept. of Rev.*, 20 OTR 408 (2011), and *City of Seattle II v. Dept. of Rev.*, 21 OTR 269 (2013) (setting out the respective Tax Court judgments). In its first opinion, the Tax Court examined, among other things, taxpayers' arguments that SB 495 violated the Oregon Constitution's revenue origination clause. For analytical purposes, the Tax Court began by assuming that the amended version of SB 495 was, indeed, a bill for raising revenue. 20 OTR at 411. The Tax Court concluded, however, that the amendments supplying that effect were not the product of the Senate but had, in fact, originated in the House. The Tax Court explained:

"The vehicle constituting SB 495, although created in the Senate, had its entire cargo relating to raising revenue

---

[4] Article IV, section 18, of the Oregon Constitution provides:

"Bills may originate in either house, but may be amended, or rejected in the other; except that bills for raising revenue shall originate in the House of Representatives."

loaded on in the House. Indeed, as the vehicle came to the House its cargo, far from being a raising of revenue, was further extension of tax exemptions. Accordingly, all of the substantive concerns that lay behind the Origination Clause are satisfied. The burden of taxation on the people originated in the House and emanated from that body."

*Id*. at 412.

In its second summary judgment opinion, the Tax Court addressed, among other things, taxpayers' contention that they did not, as a matter of law, hold, use, or otherwise have any possessory interest in the Intertie that was subject to Oregon taxation. Taxpayers' primary argument was that *Power Resources* had been wrongly decided. The department's response was that taxpayers were subject to taxation either under *Power Resources* or *Pacificorp Power Marketing*.

The Tax Court rejected taxpayers' argument and held that "*Power Resources* controls as to whether the contract relationships under the COAs result in taxpayers having property taxable in this state." 21 OTR at 273. Given that holding, the Tax Court did not find it necessary to rule on the applicability of *Pacificorp Power Marketing. Id.* Taxpayers then appealed to this court under the direct review provisions of ORS 305.445.

## II.  ANALYSIS

### A.  *Power Resources*

On appeal, taxpayers first contend that that this court wrongly decided *Power Resources* because the underlying Tax Court decision in that case had been based on the taxpayer's "incomplete and inaccurate and, therefore misleading" stipulation that its contract with BPA had given it the right to "use" a portion of the Intertie. According to taxpayers, that ill-advised stipulation led this court to incorrectly "assume" that the taxpayer in *Power Resources* possessed an "exclusive right to a definable part" of the Intertie. Taxpayers set out to rectify that claimed error by arguing that the COAs at issue here vest taxpayers only with "Scheduling Rights," *i.e.*, the right to add to and/or withdraw from the electricity being transmitted on the Intertie.

Consequently, taxpayers assert that their contracts with the BPA are simply transmission agreements that provide taxpayers with services no different from the untaxed transmission services available to noncapacity owning utilities under the federal government's Open Access Transmission Tariffs (OATTs).[5] According to taxpayers, under both taxed and untaxed transmission agreements, their only role in transmitting power over the Intertie is to tender a request for that service to BPA and then either (1) make electricity available to the agency for transmission *from* Washington State, or (2) ready the facilities needed to receive electricity transmitted *to* Washington State. That limited degree of use, taxpayers argue, is inconsistent with any kind of possessory interest in a system that is, they claim, "owned, used, and controlled exclusively by its owners—BPA, Portland General Electric Company, and PacifiCorp."

A central premise underlying taxpayers' arguments is that *use* of the Intertie is the *sine qua non* of possession for purposes of establishing taxation under ORS 307.060. Indeed, taxpayers' position appears to be that establishing the fact of the taxpayer's Intertie use in *Power Resources* was somehow central to this court's decision in that case. A brief discussion of *Power Resources*, however, demonstrates why taxpayers' position in that regard is not well taken.

In *Power Resources*, the taxpayer was a Portland-based cooperative that owned shares in a number of electrical generation facilities, among them, the Boardman Coal Plant near Boardman, Oregon. In 1992, the taxpayer entered into a long-term agreement to sell electricity from the Boardman plant to a California irrigation district. Among other things, that agreement required the taxpayer

---

[5] In 1996, pursuant to the Federal Energy Regulatory Commission's (FERC) statutory authority to remedy unduly discriminatory or preferential rates, practices, or contracts affecting public utility rates for transmission in interstate commerce, the agency issued Order No. 888 requiring all public utilities owning and/or controlling transmission facilities to offer nondiscriminatory, open access, transmission services. As part of that order, FERC required every transmission-owning public utility to file nondiscriminatory OATTs that were either consistent with or superior to the *pro forma* OATT set out in Order No. 888. FERC's *pro forma* OATT contains the minimum terms and conditions for nondiscriminatory electrical transmission service, and every transmission-owning public utility is required to abide by that tariff in providing transmission services for itself and others.

to use its "best efforts" to transmit the power it sold over the Intertie.

To meet that obligation, the taxpayer entered into a COA with the BPA in 1994. Under that agreement, the taxpayer received 50 megawatts (MW) of transmission capacity for the physical life of the Intertie in exchange for a lump sum advance payment of approximately $10.75 million and the promise to pay a proportionate share of the Intertie's operating, maintenance, and replacement expenses. The agreement expressly defined taxpayer's resulting capacity share in terms of transfer capability on the Intertie that was "owned by [taxpayer] pursuant to this agreement."

Under that COA, BPA retained all rights to operate, maintain, and manage the Intertie. Although taxpayer was entitled to 50 MW of Intertie capacity, it was required to schedule its electrical transmissions with BPA in advance and to abide by BPA's scheduling procedures. An amendment to the COA subsequently clarified that the taxpayer had a right to use its capacity share to "wheel"—*i.e.*, transmit—electricity for other entities. The agreement also permitted BPA to use any other capacity unscheduled by the taxpayer, but required the agency to compensate the taxpayer for its use.

In 1996, the department assessed the total value of the taxpayer's properties at over $45 million, an amount that included nearly $11 million as the assessed value of the taxpayer's Intertie share. In upholding that assessment over the taxpayer's challenge, the Tax Court concluded that, because the taxpayer had exclusive control, subject to reasonable limitations, over a part of the Intertie, the taxpayer "held" that part of the Intertie within the meaning of ORS 307.060 (1995).[6] Then, as now, ORS 307.060 (1995) sets out

---

[6] In that regard, the Tax Court observed:

"Although Plaintiff shares the Intertie with others, it retains exclusive control over a portion of it. Also, much like the owner of a time-share property, when Plaintiff uses the property it uses it to the exclusion of others. Plaintiff's characterization of control would require that it have exclusive control over the entire Intertie. This is unreasonable. Such a construction would similarly require that the ranchers have exclusive control over all federal grazing land or that the summer home owners have exclusive control of the National Forest. This definition of control is too broad and does not take into account the character of the property. Here, Plaintiff has exclusive use

an exception to ORS 307.040, the statute that generally exempts all property of the United States from taxation in Oregon. ORS 307.060 (1995) provided, in relevant part:

> "Real and personal property of the United States or any department or agency thereof *held by any person under a lease or other interest or estate less than a fee simple* \*\*\* shall be assessed and taxed as for the full assessed value thereof subject only to deduction for restricted use."

On appeal to this court, the taxpayer in *Power Resources* argued that, as used in ORS 307.060 (1995), the phrase "held by any person" should be construed to mean some degree of actual physical possession and occupation of a property. Under that construction, the taxpayer continued, only BPA could be said to physically "hold" the Intertie, a circumstance that effectively prevented anyone else, including the taxpayer, from "holding" it in the same sense.

This court disagreed. In doing so, the court articulated two salient points:

> "(1) [A]lthough a 'possessory' interest always is marked by some degree of control and some degree of exclusivity, neither absolute control nor absolute exclusivity is required; and (2) the test for the existence of a possessory interest necessarily varies with the nature of the property at issue."

*Power Resources,* 330 Or at 31. The court recognized that, among the indicia of exclusivity and control evident in the taxpayer's agreement with BPA, the 50 MW of electrical transmission capacity allotted to the taxpayer: (1) constituted an "exclusive right to a definable part" of the Intertie; (2) could be used—or not used—in any way that the taxpayer wished; and (3) existed as an irrevocable right for the life of the Intertie, a right that could not be diminished by adding other capacity owners to the system. *Id*. After noting that the transmission of electricity over the Intertie constituted its only apparent beneficial use, the court concluded:

> "The property involved in this case—an electric transmission grid—cannot physically be divided usefully among

---

of a portion of the premises; that is, its capacity ownership share. While it shares the total capacity with eight others, so does the rancher share the grazing land and the summer home owner share the forest."
*Power Resources Cooperative v. Dept. of Rev.*, 14 OTR 479, 485 (1998).

its owners. However, that limitation has not prevented taxpayer from investing in the expansion of the system, sharing the costs of its upkeep, and thereby obtaining *an exclusive right to use and control* the system to the extent necessary to permit transmission of 50 MW of electricity for taxpayer's own benefit. In this context, that is sufficient; taxpayer's 50 MW capacity ownership share in the Intertie is a possessory interest in that entity. Put differently, taxpayer 'holds' a share of the property that makes up the Intertie and may be assessed and taxed for that share to the extent provided in ORS 307.060."

*Id*. at 32 (internal citation omitted) (emphasis added).

Given the importance of *stare decisi*s to the judicial decision-making process, taxpayers shoulder a substantial burden in attempting to persuade us that *Power Resources* was incorrectly decided. As we observed in *Farmers Ins. Co. v. Mowry*, 350 Or 686, 698, 261 P3d 1 (2011):

"Few legal principles are so central to our tradition as the concept that courts should '[t]reat like cases alike,' and *stare decisis* is one means of advancing that goal. For those reasons, we begin with the assumption that issues considered in our prior cases are correctly decided, and 'the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent.'"

(Internal citations omitted.) Taxpayers have not persuaded us that we should abandon *Power Resources* as precedent. Nor have taxpayers persuaded us that *Power Resources* is not controlling precedent in this case.

As our discussion in *Power Resources* makes clear, the features of exclusivity and control—not use—supported our conclusion that the taxpayers in that case held a possessory interest in the Intertie. That the fact of usage was stipulated to by the parties in *Power Resources* is not helpful to taxpayers here. In this case, those same features of exclusivity and control of transmission capacity are present under facts that are virtually identical to the facts in *Power Resources*. In addition, the record shows that taxpayers' agreements with BPA allows them to (1) assign their capacity rights as security for financing purposes, (2) engage in certain capacity transfers with other capacity owners and

select Pacific Northwest utilities, and (3) with BPA consent, sell their capacity rights outright. Consequently, we hold that the degree of exclusivity and control enjoyed by taxpayers here with regard to their capacity shares in the Intertie establishes the taxability of those shares under *Power Resources.*[7]

## B.   *Article IV, Section 18*

We now address taxpayers' contention that the Oregon legislature's repeal of the 2005 property tax exemption benefitting out-of-state municipal corporations was enacted in violation of Article IV, section 18, of the Oregon Constitution. That provision requires that "bills for raising revenue shall originate in the House of Representatives." Or Const, Art. IV, § 18.

As previously noted, taxpayers—as foreign municipal corporations—were exempted from taxation on Intertie-related property rights by the enactment of Oregon Laws 2005, chapter 832, section 1. However, in 2009, some legislators sought to broaden that exemption to include electric cooperatives and, to that end, introduced Senate Bill (SB) 495 in the Oregon Senate. SB 495 passed the Senate and then moved to the House. The House subsequently removed all of the bill's substantive provisions and replaced them with provisions that effectively repealed the prior 2005 tax exemption. The House then passed the bill and returned it to the Senate, where it also passed. The bill was signed by the Governor and became law. Or Laws 2009, ch 804. As a result, taxpayers were placed on the same footing as in-state entities holding Intertie property rights and no longer had the benefit of the tax exemption. On appeal, taxpayers reprise their arguments made below that SB 495 was a "bill[] for raising revenue" and that the bill did not "originate in the House of Representatives" in violation of Article IV, section

---

[7] As previously mentioned, taxpayers separately argue that this court's decision in *Pacificorp Power Marketing*—holding that contracts between a taxpayer and a municipally-owned electric power plant demonstrated the taxpayer's "use" of the facility for taxation under ORS 308.505 to 308.565—does not apply in this case. Because we conclude that *Power Resources* establishes the taxability of taxpayers' shares in the Intertie, we need not address taxpayers' arguments regarding the taxability of those shares under *Pacificorp Power Marketing*.

18. We therefore turn to whether SB 495 was a "bill[] for raising revenue" under the origination clause.[8]

In *Bobo v. Kulongoski*, 338 Or 111, 107 P3d 18 (2005), this court adopted an analytical framework for determining whether a bill was written for raising revenue:

> "Considering the wording of Article IV, section 18, its history, and the case law surrounding it, we conclude that the question whether a bill is a 'bill for raising revenue' entails two issues. The first is whether the bill collects or brings money into the treasury. If it does not, that is the end of the inquiry. If a bill does bring money into the treasury, the remaining question is whether the bill possesses the essential features of a bill levying a tax. *See Northern Counties Trust*[ *v. Sears*, 30 Or 388, 402, 41 P 931 (1895)] (stating test). As *Northern Counties Trust* makes clear, bills that assess a fee for a specific purpose are not 'bills raising revenue' even though they collect or bring money into the treasury."

*Bobo*, 338 Or at 122.

Without question, by eliminating the 2005 tax exemption, SB 495 will "bring[] money into the treasury," thus satisfying the first prong of the analysis that *Bobo* adopted. We must determine, then, "whether the bill possesses the essential features of a bill levying a tax." *Id*. We therefore examine *Northern Counties Trus*t to elucidate the second prong of the test adopted in *Bobo*.

In *Northern Counties Trust*, this court concluded that a bill exacting court fees from parties in litigation was not "a bill[] for raising revenue" within the meaning of Article IV, section 18. 30 Or at 403. In doing so, the court adopted the federal test for determining whether a bill raises revenue for purposes of Article I, section 7, of the United States Constitution (Origination Clause):

> "[T]he history of the [origination clause] *** abundantly proves that it has been confined to bills to levy taxes *in the*

---

[8] As previously noted, the tax court assumed that the amended version of SB 495 was a "bill for raising revenue," but that the amendments supplying that effect originated in the House. Because we conclude that SB 495 was not a "bill[] for raising revenue," we do not reach the question of whether that bill originated in the House or the Senate.

*strict sense of the words*, and has not been understood to extend to bills for other purposes, *which may incidentally create revenue*. Story on the Constitution, § 880."

30 Or at 402 (emphasis supplied).

The court also cited federal cases establishing a "trend" in favor of that narrow interpretation of the origination clause. In particular, the court quoted from *The Nashville*, 4 Biss 188 (1868), and *Dundee Mortgage Trust Investment Co. v. Parrish*, 24 Fed 197 (1885):

"In *The Nashville* the court [stated]: 'It is certain that the practical construction of the provision by congress has been to confine its operation to bills, the direct and principal object of which has been to raise revenue, and not as including bills out of which money may incidentally go into the treasury, or revenue incidentally arise.' Deady, J., in *Investment Co. v. Parrish*, [stated]: 'A bill for raising revenue, or a "money bill," as it was technically called at common law, is a bill levying a tax on all or some of the persons, property, or business of the country, for a public purpose; and the assessment or listing and valuation of the polls or property preliminary thereto, and all laws regulating the same, are merely measures to secure what may be deemed a just or expedient basis for the levying of a tax or raising a revenue thereon.' This was predicated of the 'mortgage tax' law, which formerly prevailed in this state. * * * Considering the similarity of the state and national constitutions touching bills for raising revenue, and the high and unbroken line of authority upon the proper construction of the latter, it is certainly a very persuasive and weighty argument for applying the same construction to the former. The very cogent reasoning employed undoubtedly has application here, and impels us to the same conclusion touching our own state constitution."

30 Or at 400-401.

The "mortgage tax" law at issue in *Dundee Mortgage Trust* was a statute that changed where mortgage taxes were owed, shifting them from the county where the lender lived to the county where the property securing the debt was located. Thus, taxable mortgages were placed on the tax rolls of the latter counties. As noted, that change was viewed as a measure "to secure what may be deemed a just

or expedient basis for the levying of a tax or raising revenue thereon" rather than as a direct levy of a tax. 24 F at 201. In so holding, the court drew a distinction between bills that actually levy taxes and the laws that collaterally provide for an assessment or the regulation of such levies. *See also Mumford v. Sewall*, 11 Or 67 (1883) ("[I]t is not sufficiently clear that a law which merely declares that certain property heretofore exempt from taxation shall thereafter be subject to taxation is strictly a law for raising revenue. We do not feel warranted, therefore, as at present advised, in declaring the law unconstitutional on this ground.").

With that case law in mind, we turn to whether SB 495 possesses the essential features of a bill levying a tax. *Bobo*, 338 Or at 122. Before SB 495 was enacted, taxpayers, as out-of-state municipal corporations, enjoyed a tax exemption for their property interests in the Pacific Northwest AC Intertie. Here, as in *Dundee*, the subject bill was a measure "to secure what may be deemed a just or expedient basis for the levying of a tax" rather than the direct levy of a tax. *Dundee*, 24 F at 201. The repeal of taxpayers' exemption put taxpayers on the same taxation footing in Oregon as domestic electric cooperatives. Applying the narrow rule that this court adopted in *Northern Counties Trust*, we conclude that, in declaring that a property interest held by taxpayers previously exempt from taxation is now subject to taxation, the legislature did not levy a tax.

Taxpayers nevertheless argue for a different result, portraying the bill's purpose as generating additional revenue by repealing taxpayers' tax exemption. Taxpayers note that, in amending the Senate's original version of SB 495, members of the House Committee on Revenue were cognizant of the need to exploit "legitimate, lawful, and reasonable opportunities to provide revenues for badly needed public services." (Quoting comments of Gil Riddell, Association of Oregon Counties.) Taxpayers also point out that the legislature listed the bill as a revenue measure that would increase estimated property tax revenues by more than $1.2 million per biennium, and that those revenues were not earmarked for any specific purpose. *See Revenue Measures Passed by the 75th Legislative Assembly* 34 (LRO Aug 2009). Taxpayers contend that applying the framework set out in

*Bobo* leads to the conclusion that, because SB 495 ended a tax exemption, it was a bill for raising revenue.

The department counters that the purpose underlying SB 495 was to level the playing field between taxpayers—all of whom were once tax-exempt out-of-state entities—and Intertie capacity owners in Oregon—none of whom enjoyed the same tax exemption. The department contends that, although the original bill called for that goal to be met by extending exemptions to the Oregon-based entities, the goal was nevertheless achieved by removing taxpayers' exemptions instead. The department argues that that intent is demonstrated by the fact that the original version of SB 495 introduced in the Senate extended the 2005 tax exemption beyond taxpayer's Intertie holdings to include Oregon electric cooperatives that also had Intertie capacity agreements with BPA. In testimony before the House Revenue Committee, SB 495 was referred to as a "tax equity bill." *See* Audio Recording, House Revenue Committee, SB 495, May 26, 2009, at 9:27:39 (testimony of Sandy Flicker, Oregon Rural Electric Cooperative Assoc., discussing Senate version of Bill (A-Engrossed SB 495) as a "tax equity bill" to remedy inequitable treatment of electric cooperatives and stating "it's not about the money"). During the Senate floor debate following the amendment, Senator Burdick stated that the amended bill "will put everybody on the same playing field in terms of the Intertie." Audio Recording, Senate Floor Debate, SB 495, June 18, 2009 (statement of Senator Burdick in support of concurrence with House amendments and passage of B-Engrossed version of SB 495).

To be sure, the legislature likely had more than one purpose in enacting SB 495. However, under *Bobo*, our task is not to determine the primary legislative purpose for enacting SB 495. Rather, where a bill does generate revenue—as it does indeed here—our task is to determine "whether the bill possesses the essential features of a bill levying a tax." 338 Or at 122. In this case, SB 495 removes a tax exemption—it does not directly levy a tax. *See Northern Counties Trust*, 30 Or at 403 (law that exacts fees from parties to legal proceedings is not one for raising revenue under Article IV, section 18, when funds deposited into general fund); *see also Dundee Mortgage Trust Co.*, 24 F at 201

(distinguishing between bills that levy taxes and bills that collaterally provide for assessment or regulation of levied taxes).

We note that taxpayers question the vitality of *Northern Counties Trust* and *Dundee*, citing the transition that occurred in Oregon from a levy-based property tax system to a rate-based system. According to taxpayers, in the state's former levy-based system, the state determined its budget needs and then levied the taxes necessary to meet that specific goal. Because the resulting revenues were finite, repeal of a tax exemption did not create a greater influx of money into the treasury; instead, it redistributed tax burdens among taxpayers. The same is not true, taxpayers contend, of the rate-based system put into place following passage of Measure 50 in the late 1990s. Under that system, levies have been replaced by permanent tax rates, and revenues are no longer finite. As a result, taxpayers argue, repealed tax exemptions now increase revenues for the entire system, with the result that the burden of increased taxes falls solely on the newly-taxed entities.

We think, however, taxpayers' argument misses the mark because it focuses exclusively on the revenue effect of SB 495. As we stated in *Bobo*, the revenue effect of a bill, in and of itself, does not determine if the bill is a "bill[] for raising revenue." 338 Or at 122 ("If a bill does bring money into the treasury, the remaining question is whether the bill possesses the essential features of a bill levying a tax.").[9] As

---

[9] Taxpayers also cite to the Oregon legislative Bill Drafting Manual for the proposition that a repealed tax exemption in a rate-based system is a revenue raising endeavor:

"At the time *Mumford* and *Dundee* were decided, Oregon had a pure levy-based property tax system. Under a levy-based system, the repeal of an exemption would not raise any more revenue. Instead, the repeal would reduce the amount of property taxes paid by all property owners other than the owners of the formerly exempt property. Oregon's current property tax system is a rate-based system. *See* Article XI, section 11, Oregon Constitution. The repeal of an exemption in a rate-based system would raise more revenue."

*Bill Drafting Manual* 15.2 n 1 (Legis Counsel 2012); *see also* 49 Op Atty Gen 77, 84 n 4 (1998) (noting that, under rate-based tax system, "it is conceivable that a bill repealing an exemption could result in an increase in the total amount of taxes collected and, thus, constitute a bill for raising revenue").

The department responds that taxpayers' argument was drawn from the legislature's bill drafting manual on form and style, does not reflect the law

we have explained, SB 495 repeals taxpayers' tax exemption as out-of-state municipal corporations and places taxpayers on the same footing as domestic electric cooperatives. The bill does not directly levy a tax on taxpayers.

## III.   CONCLUSION

Taxpayers have not demonstrated that this court's opinion in *Power Resources* was wrongly decided. Under *Power Resources*, taxpayers' interest in transmission capacity purchased from BPA and used to transmit electricity over the Northwest's federally administered power grid may be taxed by the department as a property interest "held" by taxpayers under ORS 307.060. Additionally, the Oregon legislature's repeal of the 2005 property tax exemption previously benefitting taxpayers did not violate Article IV, section 18, of the Oregon Constitution; SB 495 was a "bill[] raising revenue" within the meaning of that provision.

The judgment of the Tax Court is affirmed.

**KISTLER, J.,** concurring in part and concurring in the judgment in part.

Relying on a 1885 federal district court decision, the majority holds that a bill that caused a tax to be imposed on plaintiffs' property was not a "bil[l] for raising revenue" within the meaning of Article IV, section 18, of the Oregon Constitution.[1] It follows, the majority concludes, that Article IV, section 18, did not require that bill to originate

_____

regarding bills for raising revenue, and is not relevant to this court's analysis. However, even if it were, the department argues, the manual does not support taxpayers' position in this case. The department notes that the manual requires that a bill intended for the purpose of raising revenue to say as much in its title and contain a clause indicating that a three-fifths majority is required for its passage. Because those requirements were not in SB 495, the department posits that the legislature would not have considered the bill to be a revenue-raising law, a conclusion in fact confirmed by Legislative Counsel and subsequently made a part of the legislative record in this case.

As we have explained, taxpayers' argument based on the change that transpired in Oregon from a levy-based property tax system to a rate-based system is not a legally sufficient argument under the test this court adopted in *Bobo*.

[1] Article IV, section 18, provides:

"Bills may originate in either house, but may be amended, or rejected in the other; except that bills for raising revenue shall originate in the House of Representatives."

in the House of Representatives. In my view, the persuasive value of the 1885 federal decision on which the majority bases its holding is doubtful. Moreover, even if the district court's decision were correct as applied to a levy-based tax system, applying that decision to a modern rate-based tax system eliminates much of the protection found in Article IV, section 18, and perhaps also in Article IV, section 25(2).[2] However, we need not resolve those issues to decide plaintiffs' Article IV, section 18, claim. It is sufficient in this case to hold that, even if the 2009 bill were a "bill for raising revenue," the bill complied with Article IV, section 18, because it effectively originated in the House of Representatives.

In *Power Resources Cooperative v. Dept. of Rev.*, 330 Or 24, 996 P2d 969 (2000), this court held that public and private entities with certain contractual rights in the Pacific Northwest Intertie have a taxable property interest in that transmission line. In 2005, the Oregon legislature exempted out-of-state public bodies from paying a tax on that interest. Or Laws 2005, ch 832, § 1.[3] Four years later, the legislature repealed that exemption. Or Laws 2009, ch 804, § 1. As a result of *Power Resources* and the 2009 repeal of the exemption, plaintiffs (out-of-state public bodies) must pay Oregon property taxes on their interests in the Intertie.

On review, plaintiffs raise two issues. First, they argue that we should overrule *Power Resources*. Alternatively, they argue that the 2009 bill repealing the 2005 exemption was a "bill for raising revenue" that, under Article IV, section 18, had to (but did not) originate in the House of Representatives. *See* Or Const, Art IV, § 18. I concur in the majority's opinion to the extent that it reaffirms *Power Resources*. However, I would resolve plaintiffs' Article IV, section 18, argument on a narrower ground than the majority does. I would hold, as the Tax Court did, that the 2009 bill, in effect, originated in the House.

---

[2] Article IV, section 25(2), provides that "[t]hree-fifths of all members elected to each House shall be necessary to pass bills for raising revenue."

[3] ORS 307.090(1) generally exempts property owned by state and local Oregon governments from property taxes. That exemption does not apply to out-of-state public bodies, however. As noted, the 2005 legislature added a specific exemption for out-of-state public bodies that hold otherwise taxable interests in the Intertie. *See former* 307.090(3) (2005).

In [*Bobo v. Kulongoski*](#), 338 Or 111, 122, 107 P3d 18 (2005), this court identified two criteria to determine when a bill will be a "bil[l] for raising revenue" that, under Article IV, section 18, must originate in the House. First, the bill must "collec[t] or brin[g] money into the treasury." *Id*. Second, it must "posses[s] the essential features of a bill levying a tax." *Id*. In this case, there is no dispute that the 2009 bill repealing the 2005 tax exemption "collects or brings money into the treasury." Repealing the exemption will result in plaintiffs paying a tax that, since 2005, they have not had to pay. The dispute turns on the second criterion—whether the 2009 bill possesses the "essential features of a bill levying a tax."

The majority relies on the federal district court's decision in *Dundee Mortgage Trust Co. v. Parrish*, 24 F 197 (D Or 1885), in determining that the 2009 bill does not possess the "essential features of a bill levying a tax." In *Dundee*, the district court held that a bill that added property to the tax rolls was not a bill that levied a tax.[4] The district court reasoned:

> "True, [the act] provides that when revenue is to be raised mortgages shall contribute thereto as land; but it does not authorize or provide for levying any tax or raising a cent of revenue."

---

[4] The Department of Revenue argues that the 1882 act at issue in *Dundee* and also in *Mumford v. Sewall*, 11 Or 67 (1883), repealed a tax exemption and that bills that repeal a tax exemption are not bills for raising revenue. The department misperceives the nature of statute at issue in *Dundee* and *Mumford*. Before 1882, Oregon statutes provided that "personal property, including debts secured by [a] mortgage, was listed to the owner in the county where he lived, and real property in the county in which it was situated.'" *Dundee*, 24 F at 201. In 1882, the legislature changed those statutes by providing that "a mortgage, deed of trust, [and the like] *** shall be assessed and taxed to the owner of such security and debt in the county, city or district in which the land or real property affected by such security is situated." Or Laws 1882, pp 64-65, §§ 1, 2.

The 1882 act had little effect on in-state lenders. For in-state lenders, the 1882 act did not change their obligation to pay state property taxes on all debts, including mortgages. It merely shifted the county in which the tax was due from the county where the in-state lender lived to the county where the land that secured the debt was located. For out-of-state lenders, however, the 1882 act had a greater effect. Before that time, out-of-state lenders may have owed personal property taxes on the mortgages in their home states, but they did not owe property taxes on their mortgages in Oregon. The 1882 act thus added mortgages held by out-of-state lenders to the class of property listed on the Oregon tax rolls; the act did not repeal an exemption.

*Dundee*, 24 F at 201. The court thus distinguished, in a levy-based tax system, between bills that put a class of property on the tax rolls and bills that actually "lev[y] a tax" on that property. *Cf. [Clackamas Cty Assessor v. Village at Main St. Phase II](#)*, 349 Or 330, 338-39, 245 P3d 81 (2010) (explaining that, in 1907, taxation consisted of a three-step process: listing property on the assessment rolls, determining the amount of taxes needed, and then levying a tax on the listed property to raise the amount of taxes needed). Put differently, the court recognized, perhaps somewhat cryptically, that the act of listing a new class of property on the tax rolls is distinct from the act of levying a tax on that property and that only the latter act is subject to Article IV, section 18. *See Dundee*, 24 F at 201.

In my view, the persuasive value of the district court's decision in *Dundee* is limited. The decision simply states a conclusion. It does not explain it. Although this court has quoted the general principles that the district court stated in *Dundee*, which it drew from Justice Story's treatise on constitutional law, until today, this court has never adopted the specific holding in *Dundee*. In *Northern Counties Trust v. Sears*, 30 Or 388, 403, 41 P 931 (1895), the court held only that a bill imposing a fee for services was not a bill for raising revenue. And in *Bobo*, the court held that a bill that redistributed money already in the treasury was not a bill for raising revenue because it did not collect or bring money into the treasury. 338 Or at 122. The court's holding today goes beyond those more limited decisions.

Beyond that, even if the federal district court's reasoning were correct in a levy-based tax system, applying that holding in a rate-based tax system is problematic, as a example will illustrate. Personal income taxes are a familiar example of a rate-based tax. Under the federal district court's reasoning in *Dundee*, the only bill that would be a bill for raising revenue would be the bill that set or changed the tax rate. Bills that expanded the definition of "income" to which the rate applied would not be subject to Article IV, section 18. However, in a rate-based system, where the tax rate is set, making property subject to that rate automatically results in its being taxed. It thus becomes more difficult

in a rate-based system to say that a bill that increases the property subject to a tax is not a bill for raising revenue.

We need not decide that potentially far-reaching issue to resolve this case. Rather, we may resolve this case on the narrower ground that the Tax Court identified. Specifically, given the unique history of the 2009 bill that repealed the 2005 tax exemption, I would hold that the 2009 bill "originated" in the House.

As noted above, *former* ORS 307.090(3) (2005) exempted from taxation certain out-of-state public entities that owned

> "tangible or intangible property, property rights or property interests in or related to the Pacific Northwest AC Intertie, as referenced in a written capacity ownership agreement executed before November 4, 2005, between the United States Department of Energy and [those out-of-state public entities]."

In 2009, the legislature passed a bill that repealed *former* ORS 307.090(3) (2005). *See* Or Laws 2009, ch 804, § 1. The bill began in the Senate but in a completely different form. *See* Bill File, SB 495, Feb 11, 2009. As introduced in the Senate, the bill added property tax exemptions to ORS 307.090 for local service districts, people's utility districts, electric cooperatives, and private utilities that had taxable interests in the Pacific Northwest Intertie. *See id.* § 1 (adding additional exemptions to ORS 307.090). As passed out of the Senate, the bill added an exemption only for electric cooperatives. *See* Bill File, SB 495, May 4, 2009 (A-Engrossed bill).

When the bill went to the House, the House made a different policy choice. The House rejected the Senate's proposed bill, which would have added an exemption for electric cooperatives that have taxable interests in the Intertie. Instead of adding another exemption, the House deleted the existing exemption for out-of-state public entities that have taxable interests in the Intertie. Bill File, SB 495, June 3, 2009 (B-Engrossed bill). The bill returned to the Senate, which concurred in the House's changes, and the Governor signed the bill.

Given that history, I would hold that, when the House removed all the operative provisions of a bill that had originated in the Senate and replaced those provisions with a bill that raised taxes, the bill "originated" in the House for the purposes of Article IV, section 18. This is not a case in which the House merely amended a bill that originated in the Senate; rather, the process that occurred here was far closer to a "gut and stuff" where the operative provisions of the Senate bill were "gutted" and the House "stuffed" new operative provisions into SB 495.[5] To be sure, the title of the bill remained unchanged. However, all the operative provisions of the bill were added in the House. Given that circumstance, I would hold, as the Tax Court did, that the bill repealing the 2005 tax exemption "originated" in the House. Accordingly, I concur in the court's opinion to the extent it reaffirms *Power Resources*, but I concur in the court's judgment to the extent it upholds the 2009 act against plaintiffs' Article IV, section 18, challenge.

Landau, J., joins in this opinion.

---

[5] "Gut and stuff" refers to "removing the text of a measure and inserting entirely new language which, while it may change the nature of the measure completely, still must fall under the measure's title, also known as the 'relating-to' clause." Oregon Legislature, Legislative Glossary, available at https://www.oregonlegislature.gov/citizen_engagement/Pages/Legislative-Glossary.aspx (last accessed July 8, 2015); *see State v. Medina*, 357 Or 254, 261 & n 6, 324 P3d 526 (2015) (explaining that gutting and stuffing frequently occurs to take advantage of a favorable relating clause). Although the revisions in SB 495 were not a classic gut and stuff, they accomplished the same result.