No. 13          March 21, 2019          263

IN THE OREGON TAX COURT
REGULAR DIVISION

Senator Brian J. BOQUIST
and Senator Herman Baertschiger,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant.*

(TC 5332)

Plaintiffs (taxpayers) sought a declaratory judgment in the Regular Division that Oregon Laws 2018, chapter 108 (Senate Bill (SB) 1528) (requiring, in part, Oregon taxpayers to "add" to their federal taxable income any amount allowable as a deduction under 26 USC section 199A(a)) violated Article IV, sections 18 and 25(2), of the Oregon Constitution (respectively the Origination and Supermajority Clauses). Taxpayers argued that SB 1528 was a "bill for raising revenue" and was invalid because it neither originated in the House of Representatives nor passed both houses of the legislature by a three-fifths majority as required by the Origination and Supermajority Clauses. On cross-motions for summary judgment, the court held that SB 1528 was not a "bill for raising revenue" because, even though it did collect or bring money into the treasury, it did not possess the essential features of a bill levying a tax because it only regulated the tax base.

Oral argument on cross-motions for summary judgment was held October 19, 2018, in the courtroom of the Oregon Tax Court, Salem.

Nathan R. Rietmann, Attorney at Law, Salem, filed the motion and argued the cause for Plaintiffs (taxpayers).

Marilyn Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant Department of Revenue (department).

Decision for Defendant rendered March 21, 2019.

**ROBERT T. MANICKE, Judge.**

### I.   INTRODUCTION

Plaintiffs seek a declaratory judgment that Senate Bill (SB) 1528 of the 2018 legislative session[1] was a "bill for

---

[1] Or Laws 2018, ch 108.

raising revenue" enacted in violation of the "Origination" and "Supermajority" Clauses of the Oregon Constitution, Article IV, sections 18 and 25(2), respectively. The parties filed cross-motions for summary judgment solely on that issue.

## II.   BACKGROUND

On December 22, 2017, United States Congress made wide-ranging changes to the Internal Revenue Code of 1986 in a law popularly known as The Tax Cuts and Jobs Acts (TCJA).[2] In one such change, the TCJA created a 20-percent deduction from taxable income for a noncorporate taxpayer with "qualified business income" from a domestic business operated as a sole proprietorship or through a partnership or S corporation. IRC § 199A(a) (2017) ("Section 199A(a)"); *see also* Prop Treas Reg § 1.199A-1, 83 Fed Reg 40884, 40885 (Aug 16, 2018) (to be codified at 26 CFR pt 1). Section 199A(a) applies to tax years commencing after December 31, 2017. Pub L No 115-97, § 11011(e).

The 2018 Oregon legislative session began on February 5, 2018. On March 2, 2018, one day before adjournment, the legislature passed SB 1528. Section 10 of the bill requires Oregon taxpayers to "add" to their federal taxable income any amount allowable as a deduction under Section 199A(a):

> "There shall be added to federal taxable income for Oregon tax purposes the amount allowable as a deduction under section 199A(a) of the Internal Revenue Code for the tax year."

Or Laws 2018, ch 108, § 10. Section 9 adds section 10 to chapter 316 of the Oregon Revised Statutes, the Oregon Personal Income Tax Act of 1969. *See* ORS 316.002.[3] Section

---

[2] Pub L No 115-97, 131 Stat 2063 (codified as amended in scattered sections of 26 USC). For procedural reasons related to its passage under budget "reconciliation" rules, the act's title was changed at a late stage from "The Tax Cuts and Jobs Act" to "An Act to provide for reconciliation pursuant to titles II and V of the concurrent resolution on the budget for fiscal year 2018." 2 USC § 644 (2018) (codifying the "Byrd Rule"); *see also* 2 USC § 641 (reconciliation procedure and rules).

[3] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to 2017.

11 states that section 10 (like Section 199A(a)) applies to tax years beginning on or after January 1, 2018. Finally, section 12 sets the effective date of the bill as the 91st day after the end of the legislative session (June 2, 2018).[4]

Each plaintiff asserts that he may be eligible for the Section 199A(a) deduction because he is an owner of one or more entities that are capable of generating "qualified business income." Each also is a duly elected member of the Oregon Senate. Defendant Department of Revenue (department) agrees that Plaintiffs have standing to bring this action as Oregon taxpayers.[5]

On June 19, 2018, Plaintiff Boquist filed the original complaint in this case. Plaintiff Baertschiger joined the case on July 6, 2018, when he and Plaintiff Boquist together filed an amended complaint before any response was filed by the department. Plaintiffs (taxpayers) later filed their Second Amended Complaint, in which the sole change was to remove individual officials originally named as codefendants with the department. The sole claim of taxpayers is that SB 1528 is of no legal force or effect because it was a "bill for raising revenue" enacted in violation of the Origination and Supermajority Clauses.[6]

The Origination Clause, Article IV, section 18, was adopted as part of the original Oregon Constitution and provides:

> "Where bills to originate. Bills may originate in either house, but may be amended, or rejected in the other; except

---

[4] Sections 1 through 8 establish a new "Opportunity Grant Fund," to provide an income tax credit for direct taxpayer contributions to that fund, and direct the Department of Revenue to auction off credits at no less than 95 percent of their face value and deposit the proceeds into the fund.

[5] Plaintiff Boquist initially claimed standing both as a taxpayer and as an Oregon senator, but neither plaintiff asserts that basis for standing in the Second Amended Complaint.

[6] Taxpayers do not assert that anything about sections 1 through 8 would cause SB 1528 to be a bill for raising revenue, either standing alone or in combination with sections 9 through 12. Nor does the department claim that sections 1 through 8 would prevent SB 1528 from being a bill for raising revenue if the court were to conclude that it is one based on sections 9 through 12. The court thus focuses its analysis on sections 9 through 12. Unless otherwise indicated, references to SB 1528 are to sections 9 through 12.

that *bills for raising revenue* shall originate in the House of Representatives."

(Emphasis added.) The Supermajority Clause, Article IV, section 25(2), was adopted by amendment on May 21, 1996, and provides:

> "Three-fifths of all members elected to each House shall be necessary to pass *bills for raising revenue*."

(Emphasis added.) The parties agree that SB 1528 did not originate in the House of Representatives or receive the approval of a three-fifths majority in either legislative chamber. *See Status Report for Legislative Measures*, 79th Legislative Assembly - 2018 Regular Session, 6-7 (originating in the Senate and passing with 16 ayes and 13 nays; in the House, passing with 32 ayes and 28 nays).

### III.   ANALYTICAL FRAMEWORK

The Oregon Supreme Court has identified three basic levels of inquiry when interpreting a provision of the Oregon Constitution: "[I]ts specific wording [of the provision], the case law surrounding it, and the historical circumstances that led to its creation." *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). When applying *Priest* to a provision of the original constitution, the purpose "is not to freeze the meaning of the state constitution in the mid-nineteenth century. Rather it is to identify, in light of the meaning understood by the framers, relevant underlying principles that may inform our application of the constitutional text to modern circumstances." *State v. Davis*, 350 Or 440, 445-46, 256 P3d 1075 (2011) (citing *State v. Hirsch/ Friend*, 338 Or 622, 631, 114 P3d 1104 (2005), *overruled on other grounds by State v. Christian*, 354 Or 22, 40, 307 P3d 429 (2013)). When interpreting a constitutional amendment, the court looks to the text, context and legislative history of the amendment, including documents introduced during any legislative referral. *See State v. Lane*, 357 Or 619, 624, 355 P3d 914 (2015).

A.   Bobo's *Two-Part Test for "Bills for Raising Revenue"*

The Oregon Supreme Court first applied the *Priest* analysis to the phrase "bills for raising revenue" in *Bobo*

*v. Kulongoski*, 338 Or 111, 119-20, 107 P3d 18 (2005). *Bobo* concerned SB 963 (2001), which retroactively transferred certain Medicaid funds out of the General Fund, resulting in a reduction of the amount of money to be returned to taxpayers as part of the statutory "kicker" refund. *Id*. at 113. Petitioners sought declaratory relief against the state, challenging SB 963 as invalidly enacted because it did not originate in the House of Representatives or receive a three-fifths vote in each chamber. *Id*.

After considering the text of the phrase "bills for raising revenue" as used in the Origination Clause, the history of that clause,[7] and the case law surrounding it,[8]

_____

[7] The requirement that "bills to raise revenue" originate in the House of Representatives can be traced back to the practices of the British Parliament. *Bobo*, 338 Or at 120 (citing *Dale v. Kulongoski*, 322 Or 240, 242-43, 905 P2d 844 (1995)). "The requirement consistently has reflected a belief that the branch of government closest to the people 'will be more watchful and cautious in the imposition of taxes' and thus should be the source of those bills." *Id*. at 120 (quoting Joseph Story, *Commentaries on the Constitution of the United States* 338-39 (1883)).

[8] *Northern Counties Trust v. Sears*, 30 Or 388, 400, 41 P 931 (1895), was the leading case on Oregon's Origination Clause and is discussed extensively in *Bobo*. For convenience, the court lists here the additional pre-*Bobo* Oregon state court opinions of which the court is aware: *Manning v. Klippel*, 9 Or 367, 373 (1881) (invalidating 1880 act providing for sheriff and court clerk fees as impermissible "local" law; declining to reach validity under Origination Clause but noting: "It would probably be valid under every other clause in the constitution."); *Mumford v. Sewall*, 11 Or 67, 71 (1883) (discussed below; 1882 law treating mortgages as taxable property did not violate Contracts Clause as applied to mortgages held by a nonresident; declining to invalidate law under Origination Clause, an issue that had not been briefed); *State v. Wright*, 14 Or 365, 367 (1887) (bill increasing charge for liquor license is exercise of state police power and not bill for raising revenue), *overruled on other grounds by Warren v. Crosby*, 24 Or 558, 568, 34 P 661 (1893); *Herbring v. Brown*, 92 Or 176, 181, 180 P 328 (1919) (discussing the meaning of the word "bill" as used in Article IV, sections 1, 18, and 19, and Article V, section 15, of the Oregon Constitution). *See also Dale*, 322 Or 240 (phrase "raising revenue" in certified ballot title of measure later enacted as the Supermajority Clause complied with requirement that titles be simple and easily understood); *DeMendoza v. Huffman*, 334 Or 425, 453, 51 P3d 1232 (2002) (citing *Northern Counties*, 30 Or at 401-02) (statute allocating percentage of punitive damage award to the state is not a revenue bill because plaintiffs had no prejudgment property interest in the award). This court first considered the Origination Clause in *Barnum v. Dept. of Rev.*, 5 OTR 508, 523, *aff'd without separate opinion*, 270 Or 867, 530 P2d 28 (1974) (citing *Northern Counties*, 30 Or at 388) (then-current version of Oregon adoption statute, ORS 109.041, which served as grounds to deny tax exemption to plaintiff-adoptee was not a "bill[] for raising revenue" when read together with inheritance tax statute in effect at the time, ORS 118.100, because the denial of exemption only "incidentally" produced revenue).

the court established a two-part framework to determine whether a bill is "for raising revenue":

> "[The first question] is whether the bill collects or brings money into the treasury. If it does not, that is the end of the inquiry. If a bill does bring money into the treasury, the remaining question is whether the bill possesses the essential features of a bill levying a tax."

*Id*. at 122. The court held that SB 963 was not "for raising revenue" within the meaning of the Origination Clause because it failed the first test in the framework: it did not "collect" or "bring" money into the treasury consistent with the meaning of those words as understood at the time the Clause was drafted. *Id*. "Raise" would have meant:

> "[t]o collect; to obtain; to bring into a sum or fund. Government *raises* money by taxes, excise and imposts."

*Id*. at 120 (quoting Noah Webster, *An American Dictionary of the English Language* (1828) (emphasis in original)).[9] The court noted that the bill did not "impose a new tax" or "increase an existing one." 338 Or at 122. Rather, the bill transferred funds already in hand from one program (the "kicker" tax refund) to another set of programs (expenditures for health-related purposes). *Id*. ("A bill that allocates existing monies among different programs does not 'raise' revenue within the meaning of [the Origination Clause] and did not have to originate in the House of Representatives."). The court then held that the same interpretation applied to the Supermajority Clause because the court saw nothing in the text or context of the Supermajority Clause that suggested that the phrase had a different meaning than in the Origination Clause. *Id*. at 123. The court did not need to reach the second part of its framework and thus did not determine whether SB 963 had the essential features of a bill levying a tax.

B.   City of Seattle*'s Application of* Bobo

        Ten years later, the Oregon Supreme Court had occasion to apply both parts of the *Bobo* framework, in *City*

---

[9] The court also identified the meaning of "revenue" as "[t]he annual produce of taxes, excise, customs, duties, rents, &c. which a nation or state collects and receives into the treasury for public use." *Id*. (quoting *Webster*, 1828).

*of Seattle v. Dept. of Rev.*, 357 Or 718, 731-42, 357 P3d 979 (2015). The issue was whether SB 495 (2009), a Senate bill repealing a property tax exemption for out-of-state public entities,[10] was a "bill[] for raising revenue" within the meaning of the Origination Clause.[11] *See former* ORS 307.090(3) (2005), *repealed by* SB 495 (codified as Or Laws 2009, ch 804, § 1).

The court in *City of Seattle* easily concluded that, by repealing the property tax exemption, SB 495 "br[ought] money into the treasury," thereby satisfying the first test within the *Bobo* framework. 357 Or at 732. In analyzing whether the bill "possesses the essential features of a bill levying a tax" under the second part of the *Bobo* framework, the court turned to its most recent pre-*Bobo* substantive opinion, *Northern Counties*, 30 Or at 388.[12]

*Northern Counties* involved an 1893 act, and its 1895 amendatory act, that changed the system of fees that county officials charged for various services and instituted fixed salaries for sheriffs, county clerks and others. The sheriff of Multnomah County refused to serve a summons in a civil suit, demanding additional fees from the plaintiff as allowed by prior law. The sheriff claimed that the 1893 and 1895 laws were invalid because they were enacted as bills for raising revenue that had been introduced in the Senate. The court considered federal cases involving three types of bills. First, the court looked to a case involving a postal rate increase bill, which the federal district court concluded was not a bill for raising revenue because a postal transaction involves a "'fixed service for the fixed rate ***.'" *Id.* at

---

[10] The plaintiffs were cities in the state of Washington that had entered into "Capacity Owner Agreements" regarding the Pacific Northwest AC Intertie, an arrangement that the court earlier had determined was subject to property tax under the provisions applicable to centrally assessed taxpayers. *Pacificorp Power Marketing v. Dept. of Rev.*, 340 Or 204, 211, 131 P3d 725 (2006).

[11] The Supermajority Clause was not at issue because the bill passed with sufficient votes to satisfy it. *Journal of the House of Representatives*, 75th Legislative Assembly - 2009 Regular Session, S-94, available at https://www.oregonlegislature.gov/chief-clerk/Documents/chiefclerk_2009-2010_house_journal.pdf (accessed Mar 14, 2019).

[12] Two relatively recent cases were not instructive. *DeMendoza* held only that plaintiffs lacked a property interest in the item they claimed was being taxed. 334 Or at 453. *Dale* held only that the phrase "raising revenue" in a certified ballot title complied with the requirement that ballot titles be simple and easily understood. 322 Or at 240.

402 (quoting *United States v. James*, 13 Blatch 207, 26 F Cas 577 (SDNY 1875)).

Second, the court in *Northern Counties* analyzed *The Nashville*, 4 Biss 188, 17 F Cas 1176, 1178-79 (1868), in which the federal district court for Indiana held that a federal law requiring any steamboat operator to prominently display a safety inspector's certificate was not a bill for raising revenue, even though the consequence of failure to do so was a fine payable to the United States Treasury. The district court held that the sole purpose of the law was to protect passengers and property, and that the law only incidentally generated revenue. *Id.*

Third, the court in *Northern Counties* focused on the decision of Judge Deady in *Dundee Mortgage Trust Co. v. Parrish*, 24 F 197 (D Or 1885). In that case, three companies sought to enjoin local officials from collecting property tax on mortgages the companies held. Oregon's 1882 "mortgage tax law" had been held to change the situs, for property tax purposes, of certain taxable mortgages or debts from the county where the lender resided to the county where the real property securing the debt was located. *Id.* at 198.[13] Judge

---

[13] In spirited opinions in an earlier case, Judge Deady concluded that the mortgage tax law had, in fact, imposed property tax on mortgages for the first time in Oregon history and that the law violated several provisions of the Oregon Constitution other than the Origination Clause. *See Dundee Mortgage Trust Inv. Co. v. School Dist. No. 1*, 21 F 151, 154-58 (D Or Aug 18, 1884) ("I think it is common knowledge that [prior law] was never understood to include either notes or mortgages as taxable property, but only the solvent debts evidenced by them, and that no mortgage was ever listed as such for taxation in this state prior to the act of 1882.") (holding 1882 act violated Oregon Uniformity Clauses and prohibition against "special or local laws," Or Const, Art IX, § 1; Or Const, Art I, § 32; Or Const, Art IV, § 23(10)); *see also Dundee Mortgage Trust Inv. Co. v. School Dist. No. 1*, 19 F 359, 363-64 (Mar 6, 1884) (explaining Judge Deady's theory of corrupt origin and application of mortgage tax law). The following year, however, the Oregon Supreme Court held that the mortgage tax law was not unconstitutional and had merely changed the situs for taxation of the underlying debt, which was taxable under pre-1882 law, declining to lend any significance to any distinction between taxation of a mortgage and taxation of the debt. *See Crawford v. Linn County*, 11 Or 482, 495-96 (1884). Judge Deady followed *Crawford* in the 1885 case cited above, *Dundee Mortgage*, 24 F 197. However, litigation over other challenges to the mortgage tax continued for many years, including in the United States Supreme Court. *E.g.*, *King v. Dundee Mortg. & Trust Inv. Co.*, 28 F 33 (D Or 1886) (declining to apply *Crawford* retroactively); *Savings & Loan Soc. v. Multnomah County*, 169 US 421, 18 S Ct 392, 42 L Ed 803 (1898) (upholding mortgage tax law in federal constitutional challenge).

Deady described a "bill for raising revenue" as a "bill levying a tax on all or some of the persons, property, or business of the country for a public purpose." *Id*. at 201. By contrast, a bill that "regulat[es]" the "assessment, or listing and valuation of the polls or property preliminary thereto," is not a bill for raising revenue, but merely a measure "to secure what may be deemed a just or expedient basis for the levying of a tax or raising revenue thereon." *Id*. Judge Deady concluded that the situs-changing feature of the bill did not "levy" a tax or "rais[e] a cent of revenue," but merely "regulated" the assessment by altering what today is commonly referred to as the "tax base."[14] *Id*.

Judge Deady also cited with approval a statement by the Oregon Supreme Court in *Mumford v. Sewall*, 11 Or 67, 71, 4 P 585 (1883). *Id*. at 200. *Mumford* involved a Contracts Clause challenge to the same mortgage tax law, and although the Origination Clause issue apparently was not argued or briefed, the court in *Mumford* observed in passing that the mortgage tax law did not seem to constitute a bill for raising revenue because it merely repealed exemption for a particular class of property:

> "Some of us have considerable doubt whether the bill is not properly a bill for raising revenue, and therefore in violation of sec. 18 of art. 4 of the state constitution, because it originated in the senate. But it is not sufficiently clear that a law which merely declares that certain property theretofore exempt from taxation, shall thereafter be subject to taxation, is strictly a law for raising revenue."

*Mumford*, 11 Or at 71.[15]

---

[14] *Webster's* defines "tax base" as "the wealth (such as real estate or income) within a jurisdiction that is liable to taxation." *Webster's Third New Int'l Dictionary* (unabridged ed 2018); *see also Black's Law Dictionary* (10th ed 2014) ("1. The total property, income, or wealth subject to taxation in a given jurisdiction. 2. The aggregate value of the property being taxed by a particular tax.").

[15] Judge Deady quoted the first sentence above, but not the second, presumably because of the court's conclusion in *Crawford*, a few months after *Mumford*, that the mortgages actually had never been exempt from tax under pre-1882 law, a determination that was significant under the then-current understanding of Oregon's Uniformity Clauses. *See generally Standard Lbr. Co. v. Pierce et al.*, 112 Or 314, 333-35, 228 P 812 (1924) (discussing *Crawford* and the later amendment of the Uniformity Clauses (Or Const, Art I, § 32; Or Const, Art IX, § 1)); Wade J. Newhouse, Jr., *Constitutional Uniformity and Equality in State Taxation* 455-60 (1959).

The court in *Northern Counties*, having thus discussed cases involving user fees for government transactions, fines for a regulatory purpose, and changes to the tax base, then turned to the 1893 county fee law before it. The court held that that law, too, was not a bill for raising revenue because it fell into the first category of exclusions, resembling the postal rate case because it exacted a charge from litigants for use of the courts, *i.e.*, a fee for the use of a particular government service, in contrast to a true "tax," which confers only the unquantifiable "benefit of good government" and affects all citizens alike. 30 Or at 402-03.

The court in *City of Seattle* applied the narrow standard of interpretation in *Northern Counties* to the second test in the two-part *Bobo* framework. Citing *Dundee Mortgage* and *Mumford*, the court concluded that the bill repealing exemption from property tax for property interests held by out-of-state public bodies did not possess the essential features of a bill levying a tax because it merely "collaterally provide[d] for assessment or regulation of levied taxes." 357 Or at 735-36. The court briefly recounted the parties' arguments about whether the bill's primary purpose was to raise revenue or to "level the playing field" among users of certain property. *Id.* at 734-35. However, the court declared it unnecessary to decide the bill's primary purpose because the bill merely affected the tax base. *Id.* at 735.

As a lower court, the Tax Court is required to apply the framework set forth in *Bobo*, as well as the additional teachings of *City of Seattle*. *See Re v. PERS*, 256 Or App 52, 54, 301 P3d 932, *rev den*, 353 Or 867 (2013) ("It is not this court's role to overrule, directly or indirectly, Supreme Court case law."); *State v. Turner*, 235 Or App 462, 466, 234 P3d 993 (2010) (declining state's invitation to cease treating venue as a material allegation that must be proved beyond a reasonable doubt "because we remain bound by Supreme Court precedent until such time as that court reconsiders and disavows it."). The court nevertheless notes that the trend among federal and state courts, like the Oregon framework, has favored a narrow interpretation of the term "bills for raising revenue" and similar common constitutional terms, limiting their application to bills to directly

levy taxes in the strict sense of the word.[16] With apparently

---

[16] Representative cases involving the Origination Clause of the United States Constitution include: *United States v. Munoz-Flores*, 495 US 385, 395, 110 S Ct 1964, 109 L Ed 2d 384 (1990) (upholding as not subject to the federal Origination Clause a "special assessment" levied on federal criminal offenders for a victims' fund) (Scalia, J., concurring in judgment); *Sissel v. Dept. of Health and Human Services*, 760 F3d 1, 10 (DC Cir 2014) (holding that the Affordable Care Act ("ACA") was not a "a bill for raising revenue" subject to the provisions of Article I, section 7, of the United States Consitution, because the ACA's revenue-raising function was incidental to the ACA's primary purpose of expanding health care coverage for citizens of the United States); *id.* at 7-8 (noting more recent trend across federal circuit courts), *adh'd to on den of reh'g*, No 13-5202, 2015 WL 6472205 (DC Cir Aug 7, 2015)); F.G. Madara, Annotation, *Application of Constitutional Requirement That Bills for Raising Revenue Originate in Lower House*, 4 ALR Fed 2d 973 (updated 2011) (listing state and federal cases).

Cases from Indiana, the source of Oregon's Origination Clause, have consistently held that the term "raising revenue" as it appears in Article IV, section 17, of the Indiana Constitution, is "confined to acts to levy taxes, in the strict sense of the word, and does not apply to bills for other purposes which may incidentally create revenue." *Stith Petroleum Co. v. Dept. of Audit and Control of Indiana*, 211 Ind 400, 404, 5 NE2d 517, 519 (1937). Most Indiana cases involve legislation that the court ultimately deemed to only "incidentally raise revenue," usually through the imposition of a regulatory or punitive fee. *See Andrews v. City of Marion*, 221 Ind 422, 430, 47 NE2d 968, 971 (1943) (holding that the fact that an ordinance imposes a charge for parking in the public street does not make it a revenue measure); *Ennis v. State Highway Comm.*, 231 Ind 311, 323, 108 NE2d 687, 693 (1952) (citing *Northern Counties*, 30 Or at 402) (act establishing toll roads was not "a bill for raising revenue" but rather a fee constitutionally exercised under state police power).

For surveys and articles on specific topics related to origination clauses *see generally* J. Michael Medina, *The Origination Clause in the American Constitution: A Comparative Survey*, 23 Tulsa L Rev 165, 188 (1987) ("The state courts have construed their respective origination clauses strictly[, determining that] the following are not revenue bills: bills delegating taxing authority to local institutions; bills which only incidentally raise revenue pursuant to an exercise of the state's police or regulatory power; and acts regulating or enforcing the collection of taxes." (Footnotes omitted.)); Thomas L. Jipping, Comment, *TEFRA and the Origination Clause: Taking the Oath Seriously*, 35 Buff L Rev 633 (1986) (discussing the history of the federal Origination Clause and its application to the Tax Equity and Fiscal Responsibility Act of 1982); Rebecca M. Kysar, *The 'Shell Bill' Game: Avoidance and the Origination Clause*, 91 Wash UL Rev 659 (2014) (discussing the Senate's practice of striking House "shell bills" and replacing the language of the bill passed by the House with the Senate's own unrelated revenue proposal—aka "a gut-and-stuff"); Paul Anthony Tortorici, Comment, *How to Raise Money: State Question 640, Revenue Bills, and the Oklahoma Supreme Court*, 71 Okla L Rev 497 (2019) (discussing the impact of three recent Oklahoma origination clause challenges on the legislative process in that state).

Other states occasionally have invalidated laws on origination clause grounds. *E.g., H.A. Thierman Co. v. Commonwealth*, 97 SW 366, 369, 123 Ky 740, (1906) (senate bill imposing a sales tax on blended spirits struck down as violative of state's origination clause); *Dumas v. Bryan*, 207 P 720, 721, 35 Idaho 557 (1922) (act providing for the removal of the state normal school to a new location

few exceptions,[17] courts generally also have upheld bills that change the tax base as not constituting bills for raising revenue. *E.g., Anderson v. Ritterbusch*, 22 Okla 761, 98 P 1002 (1908) ("omitted property" statute providing for the discovery and assessment of property not previously listed for taxation was not a bill for raising revenue), *overruled on other grounds by Fent v. Fallin*, 2014 Okla 105, 345 P3d 1113 (2014); *Cornelius v. State*, 40 Okla 733, 140 P 1187 (1914) (statute exempting certain real estate and imposing tax on mortgages held not to be a revenue bill because the bill's principal purpose was not the raising of revenue); *Leveridge v. Okla. Tax Comm'n*, 1956 Okla 77, 294 P2d 809 (1956) (statute removing a tax exemption for certain automobile models owned by used car dealers held not to be a revenue bill); *Okla. Auto. Dealers Ass'n v. State ex rel. Okla. Tax Comm'n*, 2017 Okla 64, 401 P3d 1152 (2017) (bill partially revoking an exemption from sales tax on motor vehicles was not a bill for raising revenue subject to the supermajority clause of the Oklahoma constitution because it did not levy a new tax or change an existing tax rate).

---

and levying a tax on all the taxable property within the state for specified years to pay for the construction of new buildings made necessary by the removal *held to be* an act to raise revenue); *Sierra Club v. State ex rel. Okla. Tax Comm'n*, 2017 Okla 83, ¶ 24, 405 P3d 691, 700 (2017) (bill charging a fee for hybrid and electric-drive vehicles was a revenue bill and not a "fee" because there was no direct nexus between the fee and the government benefit being conferred on the payor); *Naifeh v. State ex rel Okla. Tax Comm'n*, 2017 Okla 63, ¶ 48, 400 P3d 759, 774 (2017) (bill imposing a new $1.50-per-pack assessment on cigarettes was a revenue bill subject to the origination clause because the measure both had the "primary purpose of raising revenue for the support of state government and *** levied a new tax in the strict sense of the word").

[17] In reviewing cases holding that bills changing the tax base are bills for raising revenue, the court observes that some of the cases arise in states whose constitutions use the phrase in contexts that differ from, or that apply in addition to, an origination requirement. *See In re Opinions of the Justices*, 190 So 824, 825, 238 Ala 289, 290 (1939) (interpreting Article IV, section 70, of the Alabama Constitution, which prohibits "bills for raising revenue" from being passed during the last five days of the session); *Succession of Sala*, 24 So 674, 678, 50 La Ann 1009, 1019 (1897) (interpreting Article III, section 16 (B), of the Louisiana Constitution, which requires all bills for raising revenue or for appropriating money to originate in the House of Representatives); *see also Chadwick 99 Associates v. Dir, Div of Taxation*, 23 NJ Tax 390, 401 (2007) (interpreting state origination clause in case brought under NJ Stat Ann section 1:7-1 to -7, which provides for citizen challenge to a statute premised solely on its having been enacted contrary to the procedural requirements of the New Jersey Constitution). For further discussion of origination clauses and their impact on the legislative process in these states *see* Medina, 23 Tulsa L Rev at 190 n 142, 203-04, 210 n 286.

## C.  *Summary of Analytical Framework*

Based on the foregoing authorities, the court restates the analytical framework for determining whether a bill is "for raising revenue" as follows: First, does the bill collect or bring money into the treasury? Three examples are bills that (a) "impose a new tax," *Bobo*, 338 Or at 121; (b) "increase an existing one," *id.*; or (c) "eliminat[e] [an] exemption," *City of Seattle*, 357 Or at 732. If the bill does not collect or bring money into the treasury, it is not a bill for raising revenue, and there is no need to proceed with the second part of the framework.

If the bill does bring money into the treasury, the remaining question is whether the bill possesses the "essential features of a bill levying a tax." This question must be construed narrowly. Although no Oregon court has yet pronounced a positive definition,[18] Oregon case law clearly excludes bills that (a) impose fees for governmental services, *Northern Counties*, 30 Or at 403; (b) primarily regulate behavior or legal relationships outside the area of taxation, imposing fines, penalties, or other charges merely as an incident to regulation, *State v. Wright*, 14 Or at 374; *see also Barnum*, 5 OTR at 523-24; or (c) "regulat[e]" a tax, as by the "assessment or listing and valuation of the polls or property preliminary thereto, *** to secure what may be deemed a just or expedient basis" for the tax, *Northern Counties*, 30 Or at 403. At least when examining whether the bill "regulates" a tax or a tax base, it is unnecessary to determine whether raising revenue is the primary purpose or merely an incidental purpose of the bill. *City of Seattle*, 357 Or at 735.

## IV.   ANALYSIS

## A.  *Does SB 1528 raise revenue?*

The court's task is to ascertain the intent of the legislature by examining the text, context, and legislative history of SB 1528. *State v. Gaines*, 346 Or 160, 172, 206 P3d

---

[18] Justice Kistler, in his concurrence in *City of Seattle*, offered the following affirmative definition: "[U]ntil today, this court has never adopted the specific holding in *Dundee* [*Mortgage*]. *** Under the federal district court's reasoning in *Dundee* [*Mortgage*], the only bill that would be a bill for raising revenue would be the bill that set or changed the tax rate." 357 Or at 740 (Kistler, J., concurring in part and concurring in the judgment in part).

1042 (2009). Using these tools within the analytical framework of *Bobo* and *City of Seattle*, the court first examines the text, context and legislative history to determine whether SB 1528 collects or brings money into the treasury. *Bobo*, 338 Or at 122. The court readily concludes that it does. The words that the legislature uses in a law are paramount to understanding the legislature's intention. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009) ("[T]here is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." (Internal quotation marks omitted.)). In the case of SB 1528, the text of section 10 requires a taxpayer to "add" an amount to federal taxable income that by law the taxpayer otherwise would be allowed to "deduct." *See* Or Laws 2018, ch 108, § 10. Understood within its statutory context, this "addition" increases "taxable income," which is the dollar amount by which Oregon's income tax rate is multiplied, resulting in the dollar amount of tax due. *See* ORS 316.037(1) (imposing personal income tax on each resident individual as a percentage of "taxable income"); ORS 316.022(6) (incorporating definition of "taxable income" in IRC section 63 subject to Oregon-specific modifications); ORS 316.037 (defining amount of tax as certain percentage of "taxable income"); *see generally* ORS 316.007 (declaring legislative intent). The legislative history is replete with projections of increases to the general fund that would result from passage of SB 1528. *See, e.g.,* SB 1528 -5, -7, -8, Estimated Revenue Impacts Tables, Legislative Revenue Office (submitted to Senate Committee on Finance and Revenue on Feb 9, 2018). The court views SB 1528 as analogous to the bill at issue in *City of Seattle* that "eliminat[ed] the [property tax] exemption." In fact, SB 1528 even more clearly brings money into the treasury because the tax involved is the state income tax, which the state directly both imposes and collects, as opposed to the property tax, which is regulated by state law but imposed, collected, and spent solely by local governments. *See* ORS 310.055(3) (authorizing each taxing district to levy operating taxes on all taxable property within its boundaries; see further discussion below).[19]

_____

[19] Taxpayers argue that SB 1528 brings revenue into the treasury because it is analogous to a bill extending a tax that otherwise would "sunset," *i.e.*, expire

The department argues that SB 1528 does not bring money into the treasury but merely preserves the revenue "*status quo*." According to the department, because SB 1528 became effective quickly, it prevented Section 199A(a) from affecting Oregon taxpayers. The department's interpretation of "raising" revenue appears to require two things: (1) that the bill *increase* revenue in comparison to a benchmark amount; and (2) that the benchmark amount be set at the amount of revenue generated by the Oregon personal income tax law without regard to both SB 1528 and Section 199A(a).[20] The court rejects these requirements as inconsistent with *Bobo* and *City of Seattle*.

First, the dictionary definition of "raise" that the Supreme Court cited in *Bobo* says nothing about an increase in revenues relative to some other point in time or set of circumstances. 338 Or at 120. It uses the synonyms "collect," "obtain," and "bring." *Id*. These words do not imply a comparison. For example, they leave open the possibility that a single bill that imposes a new kind of tax, while abolishing an existing one, might "raise" revenue, even if the amount collected by the new tax is projected to be less than the amount that would have been collected by the tax being repealed.[21] In other words, bills that provide for an overall increase in revenue appear to be a subset of bills that "raise" revenue in the sense of bringing it into the treasury. It seems likely that this subset would readily satisfy the first test in

---

by a date specified in the law. Taxpayers point out examples of such extension bills (introduced before *City of Seattle*) that contain notations indicating that the legislature has determined that they are bills for raising revenue. The court's conclusion, that SB 1528 brings revenue into the treasury by analogy to elimination of an exemption, makes it unnecessary to consider this argument.

[20] At various points, the department shortcuts the description of (2) by comparing to revenue generated under "2017" law, presumably because the amendments to Section 199A(a) did not apply to tax years beginning before 2018.

[21] *Cf. Perry County v. Selma, M. & M. R. Co.*, 58 Ala 546, 557 (1877) (finding a bill that decreased taxes to be a "bill for raising revenue" subject to Alabama's origination clause) ("It is clear to our minds that increase of revenue is not implied in the language to 'raise revenue.' The transitive verb, 'to raise,' in this connection, means, 'to bring together, to collect, to levy, to get together for use or service; as to raise money, troops, and the like.'—*Webst. Dictionary*. The precise meaning in this clause is, to levy a tax, as a means of collecting revenue.").

the court's analytical framework, but other bills that do not provide for an overall increase in revenue might as well.

Second, for a bill that does "increase" revenue overall, nothing in *Bobo* or *City of Seattle* sets the benchmark in the manner the department asserts. *City of Seattle* strongly suggests that the benchmark is the revenue that would have been collected in the absence of the bill in question. It was "by eliminating the 2005 tax exemption" that the bill in *City of Seattle* brought money into the treasury. 357 Or at 732. Thus, the court appeared to be comparing (a) projected revenue after elimination of the exemption as required by the bill to (b) projected revenue *with* the exemption as required by prior law. To apply *City of Seattle*'s "but for" comparison in this case, the court must determine what law would have applied if the legislature had not adopted SB 1528.

The text of section 10 of SB 1528 makes this task easy. Section 10 refers expressly to Section 199A(a), describing Section 199A(a) as "allow[ing] *** a deduction" from federal taxable income. Federal taxable income, as set forth above, is the starting point in determining Oregon's tax base, subject to Oregon-specific modifications.[22] The court readily concludes that, if the legislature had not adopted SB 1528, no addback would be required, and the deduction allowed by Section 199A(a) would reduce the state's tax receipts from the group of affected taxpayers.

The department asks the court to apply the but-for test in *City of Seattle* not to SB 1528 but instead to both SB 1528 *and* Section 199A(a). The department points out that the legislature acted quickly, which it undisputedly did, passing SB 1528 shortly after Section 199A(a) became effective, and long before the April 15, 2019, due date for most tax returns that would reflect a deduction under Section 199A(a).[23] But leaving aside the possibility that some taxpayers might have acted on Oregon's automatic connection to Section 199A(a) during the first few months of 2018, before

---

[22] "Federal taxable income," as thus modified, is sometimes known as "Oregon taxable income." *See, e.g.*, ORS 316.013.

[23] The due date for a tax return filed by an individual or a trust or estate is the 15th day of the 4th month after the end of the tax year. IRC § 6072(a); ORS 314.385(1)(a). Individuals generally are on a calendar year, hence April 15.

the Governor signed the bill on April 13,[24] SB 1528 does not make Section 199A(a) simply disappear.

Section 199A(a), of course, remains part of *federal* law. And because Section 199A(a) allows a deduction that reduces federal "taxable income," Oregon law continues to incorporate Section 199A(a) into the definition of "taxable income" for Oregon personal income tax purposes. *See* ORS 316.022(6) (defining "taxable income" by reference to IRC section 63). This incorporation by reference of, or "connection" to, the federal definition of taxable income has been an explicit policy goal of the legislature since 1969. ORS 316.007. The principle of connection is further strengthened in a constitutional amendment, adopted in 1970 pursuant to a legislative referral, that allows "rolling" reconnection to the federal definition of taxable income. *See* Or Const, Art IV, § 32 ("Legislative Assembly *** may define *** income *** by reference to *** laws of the United States, *as the same may be or become effective ***.*" (Emphasis added.)). Rolling reconnection permits the legislature to define "taxable income" by automatically incorporating future changes that Congress might make.[25] The legislature has done so by incorporating the federal definition of "taxable income" by reference to the Internal Revenue Code "as applicable to the tax year of the taxpayer." *See* ORS 316.012(2) (personal income tax), ORS 317.010(7)(b) (corporate tax).

Rather than break this connection to federal taxable income, SB 1528 establishes an "addition" to federal taxable income. Additions, along with "subtractions" and other "modifications" of federal taxable income, are a constitutionally contemplated workaround that the legislature has used dozens of times to make its own policy decisions that are

---

[24] For example, taxpayers might have adjusted their Oregon estimated tax payments or withholdings, anticipating that they would owe less the following April. Taxpayers on a "short" tax year (such as decedents or terminating partnerships or S corporations) might even have filed returns before the Governor signed SB 1528. *See* IRS Pub 538 at 3.

[25] Article IV, section 32, of the Oregon Constitution, proposed by the legislature in 1969 and adopted by the people in 1970, allows the legislature to do this as an exception to the nondelegation doctrine. *See* Memorandum from Carlisle B. Roberts on Constitutionality of Option Provision Contained in Legislative Draft of ORS chapter 316 to Oregon Legislature (LS 2121) (Feb 8, 1967), on file with Oregon State Archives.

different from those of Congress, or to reflect federal constitutional limitations on Oregon's taxing jurisdiction as a state.[26] But SB 1528 does not terminate the incorporation of federal law, nor does it "freeze" the Internal Revenue Code at a date prior to the enactment of the TCJA.[27] Instead, every year, for as long as SB 1528 is in effect, every Oregon personal income taxpayer eligible for the deduction under Section 199A(a) for *federal* income tax purposes must (1) disclose to Oregon the taxpayer's federal taxable income, then (2) add the Section 199A(a) deduction amount back, in order to compute *Oregon* taxable income. The court has no doubt that the legislature intended SB 1528 to completely undo the net economic effect of Section 199A(a), and SB 1528 may well achieve that result, but that does not mean that Section 199A(a) ceases to exist for Oregon personal income taxpayers. Applying *City of Seattle*, SB 1528 raises revenue because, under Oregon's "rolling reconnection" approach, in the absence of SB 1528 the deduction under Section 199A(a) would apply.

B.  *Does SB 1528 have the "essential features of a bill levying a tax"?*

The second issue in applying the *Bobo* framework is whether SB 1528 has the "essential features of a bill levying a tax." Here, the court need look no further than the third category of exclusions identified in *City of Seattle* and *Northern Counties*. It is clear to the court that SB 1528 is a

---

[26] *See* Or Const, Art IV, § 32 (allowing "exceptions or modifications" to federal tax laws otherwise incorporated by reference into Oregon income tax law to accommodate "state's jurisdiction to tax and the revenue needs of the state"); ORS 316.007(1) (expressing same policy); ORS 316.048 (Oregon resident taxed on federal taxable income subject to "modifications" in ORS chapter 316); ORS 316.680 to 316.970 (compiling modifications).

[27] SB 1528 stands in contrast to the legislature's approach at the height of the recent economic recession, when it passed a short-lived law that eliminated "rolling reconnection" and instead incorporated the Internal Revenue Code as it existed on a fixed date that safely preceded the enactment of major federal tax-cutting economic stimulus provisions. *See* Or Laws 2009, ch 5, § 23 (defining "taxable income" by reference to Internal Revenue Code "as *** amended and in effect *** on December 31, 2008"); American Recovery and Reinvestment Act of 2009, Pub L No 111-5, Div B, tit I §§ 1008, 1201-02, 1211, 123 Stat 115 (2009) (among other changes, enlarging and accelerating deductions for purchases of business equipment and other assets; generally applicable to tax years beginning after December 31, 2008). The legislature reinstated rolling reconnection later in the same legislative session, for tax years beginning on or after January 1, 2011. *See* Or Laws 2009, ch 909, §§ 25, 46.

tax base bill and therefore does not have the essential features of a bill levying a tax. Like the law at issue in *City of Seattle*, as well as the mortgage tax law that was at issue in *Dundee Mortgage* and was discussed in *Northern Counties*, SB 1528 "regulates" an existing tax by "secur[ing] \*\*\* a \*\*\* basis" for that tax.[28] 30 Or at 403.

1.  *Text, context, and legislative history within the* Bobo *framework*

The text and context discussed above show that SB 1528 modifies the base of the Oregon personal income tax by creating a new addition that modifies federal "taxable income." The statute *imposing* tax on the tax base is ORS 316.037, which plainly states: "*A tax is imposed* for each taxable year on the entire taxable income of every resident of this state." ORS 316.037(1)(a) (emphasis added) (defining tax amount as graduated percentages of taxable income).[29] SB 1528 simply joins the ranks of numerous other addbacks, subtractions, and other modifications to federal taxable income that the legislature has created to modify the federal tax base in order to enact the legislature's own policy choices different from those of Congress. *See* ORS 316.680 - 316.970.

Although there is ample legislative history concerning the overall purposes of SB 1528, which taxpayers urge the court to consider,[30] within the *Bobo* and *City of Seattle* framework the scope of the court's inquiry is limited to

---

[28] The court sees nothing supporting a conclusion that SB 1528 fits into the fee-for-services exclusion or the exclusion for bills that primarily regulate behavior or relationships. Neither party argues that it does.

[29] Similarly, subsections (2) and (3) of ORS 316.037 explicitly impose tax on part-year residents and nonresidents, respectively.

[30] In post-oral argument submissions, the parties addressed the extent to which this court, applying *City of Seattle*, should consider the primary purpose of SB 1528. Taxpayers concluded, and the court agrees, that *City of Seattle* requires the court to determine that the bill at issue levies a tax before the court can examine whether the bill has the primary purpose of raising revenue. 357 Or at 735 ("However, under *Bobo*, our task is not to determine the primary legislative purpose for enacting SB 495."). Taxpayers apparently would add a "primary purpose" analysis as a third step to *Bobo*'s two-part framework, if a court has decided that a bill has the "essential features of a bill levying a tax." This court does not reach whether a third analytic step would be appropriate, because, as discussed below, the court concludes that SB 1528 changes the existing personal income tax base in a manner analogous to the change to the property tax base in *City of Seattle* and thus lacks the essential features of a bill levying a tax.

discerning whether the legislative record is or is not consistent with the court's conclusion based on text and context that the legislature intended to change the tax base. The court finds the legislative history to be consistent with that conclusion. Statements by legislators from both parties, including vigorous floor debates, show that legislators were aware that they were voting on whether Oregon law should (a) incorporate the recently enacted federal deduction under Section 199A(a); or (b) disconnect from that deduction.[31]

### 2.  *Parties' arguments*

Taxpayers argue that SB 1528 does, in fact, impose a tax.[32] (SB 1528 "impos[es] Oregon income tax on 'the amount allowable as a deduction under section 199A(a)' ***."); ("SB 1528 created a legal obligation to pay a tax on Section 199A(a) income at the rates set forth in statute the instant it became law.") These statements ignore the distinction that the Supreme Court has drawn between a bill that levies or imposes a tax and one that changes the tax base. Oregon does not impose its tax on the amount deducted under Section 199A(a), the corresponding addback amount under SB 1528, or even on "qualified business income" as used in Section 199A(a). Rather, Oregon taxes federal "taxable income" as modified for Oregon purposes, which is affected by a host of variables and thus may be dramatically different from the amount a taxpayer deducts under Section 199A(a) and adds back under SB 1528.[33]

---

[31] The parties supplied the court with numerous exhibits from the legislative record, as well as transcripts that they had prepared of the unusually extensive floor debates in the Senate, (Transcript, Senate Floor Debate on SB 1528, Feb 23, 2018, 79th Legislative Assembly - 2018 Regular Session), as well as hearings from the House Revenue Committee (Transcript, House Committee on Revenue, SB 1528, Feb 28, 2018, 79th Legislative Assembly - 2018 Regular Session), and debate from the House (Transcript, House Floor Debate on SB 1528, Mar 2, 2018, 79th Legislative Assembly - 2018 Regular Session).

[32] As noted above, taxpayers' argument is the predicate for their argument that the court must determine the primary purpose of SB 1528.

[33] For example, in the case of any particular taxpayer in any one year, one or more of the Oregon subtractions or modifications might offset or exceed the amount of the addback under SB 1528. An Oregon resident might claim a $5,000 deduction under Section 199A(a), add it back to taxable income under SB 1528, but have a total of $5,800 in Oregon-only subtractions for elderly medical care expenses (*see* ORS 316.693) and contributions to Oregon's college savings program or to an ABLE account (*see* ORS 316.699). Together, the latter two

Taxpayers' assertion can be interpreted as making the larger point that changing the tax base can increase revenue as effectively as imposing a new tax or changing a tax rate. This is certainly true as a matter of arithmetic. For example, a bill that undoes widely used deductions such as those for residential mortgage interest or charitable contributions could increase state revenues significantly.[34] On an even larger scale, redefining "taxable income" to mean gross receipts, without any deductions or exclusions, no doubt would substantially expand the tax base, particularly for individuals and other personal income taxpayers that receive taxable income from a business, which presently is measured net of business expenses. *See* IRC § 63 ("Except [for individuals who do not itemize their deductions], 'taxable income' means gross income minus the deductions allowed by this chapter * * *."); IRC § 162(a) (allowing as a deduction for ordinary and necessary business expenses). Laws that make these sorts of changes over a period of years might incrementally transform a "traditional" net income tax base into one that is not recognizable as such. All of these changes, and more,[35] could occur without any amendment to the "imposition" language and without altering the tax rate percentages in ORS 316.037. However, the case before the court does not involve the repeal of multiple deductions, exemptions or exclusions, or a wholesale redefinition of the tax base. Rather, the present case is a clear example of a modification that adds back the amount of a single deduction, a change to the tax base that is well within the framework of *Bobo* as applied in *City of Seattle*.

---

subtractions exceed the addback, making it logically impossible to attribute or trace any tax liability to the addback amount. Other combinations of Oregon subtractions might offset or exceed a taxpayer's entire income, leaving no "taxable income" and thus no tax, despite the addback.

[34] *See* Oregon Department of Revenue, 2015-2017 Oregon Tax Expenditure Report, at 10-11, 15, available at https://www.oregon.gov/DOR/programs/gov-research/Pages/research-tax-expenditure.aspx (accessed Mar 14, 2019) (estimating revenue impact of home mortgage and charitable contribution deductions at, respectively, $970,300,000 and $651,000,000 for 2019-21 biennium).

[35] Additional possible changes might include resetting the tax "brackets," *i.e.*, the levels of taxable income at which personal income tax rates ranging from 5 percent to 9.9 percent apply, *see* ORS 316.037, or perhaps setting a minimum level of personal income tax that is determined by some other measure, such as gross receipts in the manner Oregon presently uses for C corporations. *See* ORS 317.090(2).

Taxpayers rely on *Homebuilders Assoc. of Metro. Portland v. Metro*, 250 Or App 437, 444, 281 P3d 621 (2012). That case involved a construction excise tax that the Metro regional government adopted in 2006. *Id.* at 440. The 2007 Legislative Assembly enacted a law providing that a "local government *** may not impose a tax" on the privilege of constructing real property improvements, but the 2007 law excepted existing local taxes and allowed their extension or continuation so long as the rate did not increase. *Id.* at 443 (quoting Or Laws 2007, ch 829, § 1(1)). Metro retained its grandfathered tax and, in 2009, adopted amendments that, among other things, "expanded the allowable uses of tax proceeds [and] permitted payment of [Metro's] administrative expenses from those proceeds ***." *Id.* at 446. Plaintiffs challenged the amendments, claiming that they were material alterations that effectively imposed a new tax. *Id.* at 439. The court rejected the plaintiffs' challenge, holding that the amendments did not "impose" a tax as prohibited by the 2007 state law. *Id.* at 445. The court stated: "The use of tax proceeds does not directly bear on the imposition of the charge, *unlike, for instance, the class of persons or things being taxed or the rate of the tax.*" *Id.* (emphasis added).

Taxpayers appear to rely on the view expressed in the emphasized language in arguing that SB 1528's change to the tax base is equivalent to an increase in the rate, which constitutes imposition of a tax, and thus bears the "essential features of a bill levying a tax" for purposes of the second test within the *Bobo* framework. This court disagrees. The emphasized language, in the context of the larger opinion, obviously is intended as an illustration, as no party in *Homebuilders* appears to have asserted that Metro's amendments actually made any change to the "class of persons or things being taxed." More importantly, *Homebuilders* is inapposite to this case. In *Homebuilders*, the issue involved the scope of a prohibition that the legislature enacted and that applied to local governments. Metro, not the legislature, was the body imposing the tax. Therefore, neither the Origination Clause nor the Supermajority Clause could apply to Metro's ordinance, as both clauses refer to chambers

of the Oregon Legislature. Accordingly, the Oregon Court of Appeals had no reason to consider the *Bobo* framework or any of the exclusions that the Oregon Supreme Court has identified for state statutes being tested under either clause.

Taxpayers also emphasize the amount of revenue that SB 1528 is projected to raise—more than $1 billion over a six-year period. This fact is well documented and is uncontested. *See, e.g.*, SB 1528 -B, Revenue Impact Statement, Legislative Revenue Office (submitted to House Committee on Revenue on Feb 28, 2018). However, *City of Seattle* fully addresses this point: "As we stated in *Bobo*, the revenue effect of a bill, in and of itself, does not determine if the bill is a 'bill[] for raising revenue.'" 357 Or at 736 (quoting *Bobo*, 338 Or at 122). Taxpayers seek to distinguish *City of Seattle* on the ground that the revenue projected from SB 1528 is orders of magnitude greater than in *City of Seattle*. Taxpayers' point may be factually correct, but taxpayers point to no principle consistent with precedent that allows such a distinction. Although the size of a revenue increase may be useful as a factor in determining the legislature's primary purpose in enacting the law, this court, as discussed, has no occasion to examine the purpose or purposes of SB 1528 because the act fits within the exclusion for tax base bills, following *City of Seattle*.

Taxpayers argue that this court can distinguish *City of Seattle* because SB 1528 involves a tax levied directly by the state, while the taxes in *City of Seattle* were levied locally, although pursuant to state law. ("[I]n *City of Seattle*, the court * * * was able to readily conclude that a law repealing a property tax exemption, *which did not create any legal obligation to pay a charge without a subsequent local government levy*, was not a bill levying a tax." (Emphasis added.)) (*See* Statement of Rietmann, Oral Argument, Oct 19, 2018, 10:15:30 ("The property tax system is different, you assess the property and then the actual imposition, what creates the obligation to pay the charge, is the levy.")). The problem with taxpayers' argument is that the court in *City of Seattle* was fully aware that Oregon property tax law functions as an enabling act for localities—the department reminded

the court of that in its briefing[36]—but the court declined to base its holding on that feature of property tax law. Instead, the court based its opinion on the fact that the bill at issue merely "remove[d] a tax exemption" and thus only "collaterally provide[d] for assessment or regulation of levied taxes." 357 Or at 735-36.

Taxpayers also ask the court to distinguish this case from *City of Seattle* because that case did not involve the Supermajority Clause. In *Bobo*, the court recounted that the people added the Supermajority Clause in 1996, after a legislative referral, and the court concluded that "nothing in the text or context of [the Supermajority Clause] suggests that the phrase 'bills for raising revenue' in Article IV, section 25(2)[,] has a different meaning than it has in [the Origination Clause]." 338 Or at 123. Taxpayers, citing the more recent approach to constitutional interpretation set forth in *State v. Lane*, 357 Or 619, 624, 355 P3d 914 (2015), urge this court to examine the enactment history of the Supermajority Clause, which the court in *Bobo* did not reach.

The court agrees with taxpayers that an examination of the enactment history of the Supermajority Clause is appropriate. Under the Supreme Court's current precedent, this court must "interpret referred constitutional amendments within the same basic framework [used for] statutes: by looking to the text, context, and legislative history of the amendment to determine the intent of the voters." *State v. Sagdal*, 356 Or 639, 642, 343 P3d 226 (2015). "The history of a referred constitutional provision includes 'sources of information that were available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure,' such as the ballot title, arguments included in the voters' pamphlet, and contemporaneous news reports and editorials." *Id.* at 642-43 (quoting *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559

---

[36] In its Answering Brief in *City of Seattle*, the department argued that the bill repealing the exemption did not levy a tax and contrasted that bill with ORS 310.055(3), which provides, in relevant part: "'For tax years beginning on or after July 1, 1998, each taxing district is authorized to levy the full amount of the operating taxes of the district on all taxable property within the boundaries of the district.'" The department also made it clear that the property tax brings money "into the treasury of counties around the state."

n 8, 871 P2d 106 (1994)). The sources available to the public may include any statements or documents introduced during the legislative deliberation leading up to the referral to the people, and the court should assign them whatever weight is warranted in the circumstances, taking into account factors such as their probative quality. *See Lane*, 357 Or at 634.

Taxpayers cite documents that the legislature had before it when adopting and referring the proposed Supermajority Clause in HJR 14 (1995), as well as excerpts from the voters' pamphlet on the referred measure, known as "Measure 25," which the people then approved in 1996. *See* Exhibits H, I, Senate Committee on Rules and Elections, HJR 14, May 24, 1995 (submitted by Rep Ray Baum); Exhibits R, S, Senate Committee on Rules and Elections, May 25, 1995 (submitted by Staff); Official Voters' Pamphlet, Biennial Primary Election, May 21, 1996. Before discussing those documents, the court observes that neither party pointed out that the text of HJR 14 underwent a significant amendment that the court finds highly indicative of its meaning. As originally introduced, the text of HJR 14 deviated slightly from the wording of the Origination Clause: the text originally referred to "bills raising revenue." HJR 14 (1995) (as introduced). In the latter part of the session, the House Committee on Legislative Rules held a hearing on HJR 14 at which an attorney in the Office of Legislative Counsel was invited to testify. The attorney stated: "If you want this provision to apply whenever Article IV, section 18[,] applies, the language here will do that, *probably*. If you want to be *certain* of that, you'll want to add the word 'for' at the end of line 8." Tape Recording, House Committee on Legislative Rules, HJR 14, Apr 6, 1995, Tape 35, Side A (statement of Dexter Johnson) (emphases added). The committee then did exactly that. At the next hearing and work session three weeks later, the committee approved an amendment inserting the word "for," rendering the phrase identical to that in the Origination Clause. After HJR 14, as thus amended, had passed the full House, the chair of the House committee, Representative Ray Baum, appeared before his counterpart committee in the Senate, testifying that the bills covered by HJR 14 are "those that would have to [originate] in the House under the constitutional provision that says that

bills involving revenue must originate in the House." Tape Recording, Senate Committee on Rules and Elections, HJR 14, May 24, 1995, Tape 80, Side A (statement of Rep Ray Baum). In response to a question whether HJR 14 would apply to a fishing license fee increase, Representative Baum answered no, because courts interpreting the same language in the Origination Clause had reached that conclusion. *Id*. The court finds that these statements and actions strongly support the court's conclusion in *Bobo* that the 1995 Legislative Assembly intended "bills for raising revenue" to have the same meaning in the new Supermajority Clause as in the existing Origination Clause.[37]

Taxpayers refer to a 10-page memorandum dated March 22, 1993, that was written by a law clerk within the Office of Legislative Counsel and transmitted to the Senate Rules and Elections Committee during the 1995 session for consideration in connection with HJR 14. Memorandum from Scott L. Shapiro to Jeannette K. Holman (Mar 22, 1993) (incorporated in Exhibit I, Senate Committee on Rules and Elections, HJR 14, May 24, 1995 (submitted by Rep Ray Baum)). The memorandum addresses the meaning of "bills for raising revenue" in the Origination Clause, surveying cases including *Northern Counties* and *Mumford*. In the course of its exposition, the memorandum quotes the discussion in *Northern Counties* of three types of bills that are *not* "for raising revenue": bills that impose fees for services (referring to *United States v. James*), bills that regulate conduct (*The Nashville*), and bills that change a tax base (*Dundee Mortgage*). *Id*. at 3-4. The memorandum goes on to summarize numerous Oregon attorney general opinions and non-Oregon cases involving the origination clauses of the Indiana and federal constitutions, some of which also involve bills setting fees for services, regulating conduct, or

---

[37] The court notes that one senator (in the minority party) asked Representative Baum whether HJR 14 would similarly restrict the legislature's ability to create or enhance "tax credits, exemptions, and deductions." Tape Recording, Senate Committee on Rules and Elections, HJR 14, May 24, 1995, Tape 80, Side B (statement of Sen Dick Springer). Representative Baum answered in the negative, and the Senate committee later rejected an amendment proposed by Senator Shirley Gold (also from the minority party) that would have amended HJR 14 to that effect. *Id*. at May 25, 1995, Tape 82, Side A (statement of Sen Shirley Gold).

establishing local port or school entities with tax-levying authority. *Id.* at 5-10.

The memorandum concludes that the test for a bill for raising revenue is whether raising revenue is the bill's "primary purpose" or merely an "incidental" purpose. *Id.* at 10. Oddly, however, the memorandum's four-part test for determining whether the purpose is incidental seems to identify only whether the bill levies a fee for a specific government service.[38] *Id.* The test does not mention other types of non-revenue-raising bills that the memorandum discusses. Although the memorandum poses the comprehensive question of what constitutes a bill for raising revenue, its conclusion lays out the elements only of the one exclusion that had been squarely adjudicated in the Oregon Supreme Court, namely the fee-for-service bill at issue in *Northern Counties*.

The court assigns little weight to the 1993 memorandum for purposes of this case. Assuming that legislators and the people accepted its description of the relevant authorities and its conclusions,[39] the court finds nothing in the memorandum that argues against the analysis in *Dundee Mortgage*, or the remark in *Mumford*, both of which were recounted favorably in *Northern Counties*, that a bill changing the tax base is not one for raising revenue. The conclusion in the memorandum is internally inconsistent, or at least incomplete, in that it fails to identify a test (or a set of tests) that applies to each of the kinds of bills it discusses. Thus, while the legislators and the people may have accepted the memorandum's point that it is *generally* necessary to identify the primary and incidental purposes

---

[38] "The four-part test is: (1) Is there a fee that is paid; (2) Does the payer receive something in return; (3) Is the thing received something other than 'good government' enjoyed by everyone: and (4) May the payer choose not to pay the fee and thus to give up the benefit afforded under law? If the answer to all four questions is 'yes' then there is no requirement that the act under which authority the fee is imposed must originate in the house of representatives." *Id*.

[39] Except for one brief mention by Representative Baum in a hearing, noting that the memorandum existed, the court found no evidence in its review of the legislative history of HJR 14 that the legislature debated its contents. Tape Recording, Senate Committee on Rules and Elections, HJR 14, May 24, 1995, Tape 80, Side B (statement of Rep Baum). Neither party provided any evidence that the memorandum was discussed during the referendum campaign.

of a bill, they would not necessarily have believed that it is appropriate to do so in the case of a base-broadening bill.[40]

Excerpts from the voters' pamphlet circulated during the 1996 referendum campaigns for and against Measure 25 make a wide range of statements. The official explanatory statement submitted by the committee appointed pursuant to ORS 251.215 (1995) states:

> "Ballot Measure 25 would require that at least three-fifths of the members of each house approve a bill for raising revenue in order for it to pass. In the 30-member Oregon Senate, this will increase from 16 to 18 the number of Senators required to approve *a bill which raises taxes.* In the 60-member Oregon House of Representatives, the number of Representatives required will increase from 31 to 36.

> "Ballot Measure 25 would apply only if a bill has a *primary purpose* of raising revenue. A bill that only *incidentally* raises revenue and that has a primary purpose other than raising revenue would not be subject to the three-fifths vote requirement."

---

[40] Taxpayers also emphasize an excerpt from a staff measure summary dated May 25, 1995: "'This section[, *i.e.*, the Origination Clause,] has been interpreted to apply to bills whose primary purpose is to raise revenue, but not necessarily all bills that result in revenue.'" Exhibit R, Senate Committee on Rules and Elections, May 25, 1995 (submitted by Staff) (Taxpayers' motion gives the date of the staff measure summary as "April 25, 1995."). That document, like the 1993 memorandum, is consistent with the Oregon Supreme Court's conclusion in *City of Seattle* that a "primary purpose" analysis is not required if the bill lacks the essential features of a bill levying a tax because it merely changes the tax base. Taxpayers later quote an excerpt from a revenue impact statement dated May 29, 1995, that contains a similar sentence and ends with: "'For example, a tax rate increase must start in the House, while a bill that creates a licensing board and also imposes a fee can begin in either house.'" Revenue Impact Statement of HJR 14B (May 29, 1994). That passage adds only the unremarkable point that a rate increase bill can be a bill for raising revenue.

In addition to citing specific documents, taxpayers also repeatedly characterize the period in which the Supermajority Clause was enacted as a time of "tax revolt." Taxpayers do not explain or elaborate on this comment. The court is aware that the voters adopted the constitutional change known as Measure 47 by initiative in 1996, and that the legislature revised it and referred it back to the voters, who adopted it in 1997 as Measure 50. Or Const, Art XI, § 11. *See generally Flavorland Foods v. Washington County Assessor*, 334 Or 562, 564-65, 54 P3d 582 (2002) (discussing background of Measures 47 and 50). Whatever the contemporaneous passage of that property tax limitation measure might say about voter sentiment toward taxes generally, it says nothing about the specific issue here: whether the voters had any particular view about whether to treat a tax base-broadening bill as a bill for raising revenue.

Voters' Pamphlet at 23 (emphases added). This statement, like the passage from the May 25, 1995, staff measure summary cited above, is unenlightening because it says nothing about changes to the tax base and is otherwise consistent with *City of Seattle*'s later conclusion that it is necessary to analyze whether the bill has the essential features of a bill levying a tax before undertaking a "primary purpose" analysis.

The "Legislative Argument in Support," submitted by a legislative committee as required by a 1993 law,[41] repeats the foregoing "primary purpose" statements nearly word for word. Like the 1995 staff measure summary quoted above, it also specifically emphasizes that bills imposing higher tax rates or new taxes would be subject to the supermajority requirement:

> "Voting yes on Ballot Measure 25 will make it more difficult for the Oregon legislature to *increase tax rates or to impose new taxes*. Ballot Measure 25 would amend the Oregon Constitution to require that three-fifths of the members of both the Senate and the House of Representatives vote for a bill for raising revenue, if the bill is to become law. Ballot Measure 25 would thus ensure that *higher tax rates or new taxes* could be passed by the legislature only if there was broad consensus throughout the state on the need for such measures.
>
> "Voting yes on Ballot Measure 25 will not cause legislative gridlock. The three-fifths vote requirement would *apply only to bills that have a principal purpose of raising revenue*. If a bill *only incidentally raises revenue*, the bill would not be subject to the three-fifths vote requirement, and would need only a simple majority of each house of the legislature to pass. For example, a *bill that increased the penalty for being convicted of a particular crime* from $1,000 to $2,000 would raise revenue only *incidentally* to the bill's primary purpose of increasing a criminal sanction and therefore would not be subject to the three-fifths vote requirement. By contrast, a bill that *raised income tax rates* from nine percent to ten percent would be a bill that had as its principal purpose raising revenue; the bill would be subject to the three-fifths vote requirement under Ballot Measure 25.

---

[41] *See* Or Laws 1993, ch 811, § 10.

"Adopting Ballot Measure 25 will result in a state government that is more responsive to the voters by limiting the state's ability to impose higher taxes or new taxes on the public to only those cases where there is substantial majority support for those taxes. We urge your support of Ballot Measure 25."

*Id.* at 24 (emphases added). The court finds nothing in the Legislative Argument in Support that adds any insight as to the people's intentions with respect to a base-broadening bill.

The voters' pamphlet contains six additional statements, all of which are in opposition to Measure 25. *Id.* at 24-27. In addition to policy-based arguments, five of these statements emphasize that the measure will apply to a broad range of routine bills. A statement by Governor Kitzhaber describes the measure as "vague" because "it is unclear to which revenue issues Measure 25 would apply." *Id.* at 25. As an example, the Governor's statement argues that it is uncertain whether the measure would apply to a bill that "lowers one tax, raises another but is revenue neutral overall," or whether the measure would "prevent Oregon from keeping our tax code consistent with the federal code." *Id.* Other statements caution that the breadth of the measure would result in "government gridlock," *id.* at 26 (statement of Oregon Public Employees Union), and "minority rule," *id.* at 24 (statement of Oregon Education Association), and that is "undemocratic," *id.* at 26 (statement of Oregon School Boards Association; Confederation of Oregon School Administrators). Two statements warn that Measure 25 would subject bills imposing fees for government services to the supermajority requirement, such as a hypothetical "fee" imposed on "a large company [that is] a heavy user of water," *id.* at 24, or a charge imposed on teachers to pay for a criminal background check at the time of licensure, *id.*, or "safety and environmental inspection charges, and fees required to operate many enforcement divisions of state government," *id.* at 25.

Three of the statements in opposition appear to address base-broadening bills specifically, arguing that Measure 25 would impair the legislature's ability to "repeal *** an excessive corporate or special interest tax credit,"

*id.* at 25, "eliminat[e] a tax break," or "revis[e] \* \* \* the tax credits and exemptions [that the state] grants to encourage economic growth," *id.* at 27 (statement of Human Services Coalition of Oregon). One of these implies that courts might require the legislature to apply a "primary purpose" test in order to determine whether a bill changing a tax "break" is a bill for raising revenue. *Id.* at 26 (statement argues that attempts to apply that test would create confusion and uncertainty for the legislature). The Human Services Coalition of Oregon's statement contains a similar implication, stating that "fairly common" "minor revenue revisions," such as "revisions to the tax credits and exemptions [that the state] grants to encourage economic growth," would become "impossible" under Measure 25. *Id.* at 27.

Considering all of the enactment history, the court first concludes that the people certainly intended to require a supermajority for bills that "increase tax rates or \* \* \* impose new taxes," a consequence that the proponents expressly predicted and the opponents did not dispute. *See id.* at 24. The court also concludes that the people intended to incorporate into Measure 25 the courts' then-existing interpretations of "bills for raising revenue" as used in the Origination Clause, and to cause the phrase to be interpreted identically for purposes of both clauses in the future. The legislature's one-word amendment of HJR 14 to conform precisely to that phrase, based on the advice of counsel to make the amendment "[i]f you want this provision to apply whenever Article IV, section 18[,] applies," leaves little room for doubt. The court has found nothing in the enactment history at odds with these basic conclusions.

The court's remaining task is to determine specifically whether the opponents' arguments in the voters' pamphlet evince an intention of the people that base-broadening bills are bills for raising revenue and thus require a supermajority vote. The court starts by noting that the voters rejected the opponents' position and approved Measure 25. However, that fact gives the court no evidence of the voters' intention on the issues in this case, as the record does not reveal whether the voters approved Measure 25 because they (a) disbelieved the opponents' arguments and viewed Measure 25 as applying only to bills

levying new taxes or increasing tax rates; (b) were skepti-
cal of, or indifferent to, the opponents' arguments and were
willing to take the risk that Measure 25 might slow down
or prevent some base-broadening bills; or (c) enthusiastically
believed the opponents' arguments and wanted to stop as
many base-broadening bills as possible. Possibly, the voters
who approved Measure 25 comprised persons holding a mix
of these and other views.

The court next weighs the "'substance and proba-
tive quality'" of the opponents' arguments against the other
information available to the people. *See Lane*, 357 Or at 634
(quoting *Gaines*, 346 Or at 172). The opponents' arguments
contain little or no analysis or reasoning; indeed, the space
limitations in the voters' pamphlet do not lend themselves
to extended analysis.[42] Voters comparing the statements
to court decisions, or even to the summaries in the 1993
memorandum of the Office of Legislative Counsel, would
have found the voters' pamphlet arguments to be insubstan-
tial at best. The warnings that Measure 25 would apply to
bills that broaden the tax base by repealing tax "breaks"
contain no reasoning, and they run counter to the holding
in *Dundee Mortgage*, recounted in *Northern Counties*, as
well as the Supreme Court's own statement in *Mumford*.[43]
Similarly, the court assigns little weight to the implication
that a "primary purpose" analysis is necessary in the case of
a base-broadening bill, as the statement does not attempt to
deal with the question of whether such a bill has the essen-
tial features of a bill levying a tax. The opponents' state-
ments do not persuade the court that the voters intended to
treat a base-broadening bill as one for raising revenue.

Finally, taxpayers urge the court to look to the leg-
islature's "longstanding contemporaneous interpretation"
of the Origination and Supermajority Clauses to determine

---

[42] Each statement was limited to 30 square inches or 325 words. Or Laws
1993, ch 811, § 11.

[43] The warnings about base-broadening bills also suffer from bad company:
they appear adjacent to, or even in the same argument with, warnings that the
new Supermajority Clause would apply to fees for services. The latter warnings
plainly contradict the holding in *Northern Counties*, the conclusions of the 1993
Office of Legislative Counsel memorandum, and the testimony of Representative
Baum on HJR 14 itself. Voters' Pamphlet at 13-27.

whether SB 1528 is a bill for raising revenue. Taxpayers make this point in both their opening brief and on reply, seeking to rebut the department's contentions that SB 1528 does not "raise revenue." Taxpayers use the same phrase when asserting that SB 1528 lacks the essential features of a bill levying a tax. Taxpayers' argument appears to conflate three concepts: (1) that the legislature's "contemporaneous" interpretation of a constitutional provision (*i.e.*, an interpretation adopted at about the same time as the constitutional provision) offers insight as to the meaning of the constitutional provision; (2) that the court should defer to the legislature's longstanding practical construction of a statute, especially when rights have accrued in reliance upon it;[44] and (3) that the court should defer to the legislature's interpretation of the constitution to the same extent that courts defer to an administrative agency's interpretation of a statute. In this case, the court finds none of these concepts persuasive, separately or in combination.

As to the first concept, when a constitutional provision's meaning is unclear, a court may look to a contemporaneous construction of the provision by the legislature, especially where the construction has prevailed for a long period. *See, e.g.*, *Printz v. United States*, 521 US 898, 905, 117 S Ct 2365, 138 L Ed 2d 914 (1997) ("[C]ontemporaneous legislative exposition of the Constitution ***, acquiesced in for a long term of years, fixes the construction to be given its provisions." (Citation omitted; ellipsis in *Printz*.)). However, a review of Oregon case law on this doctrine makes clear that in order for a court to give weight to the legislature's contemporaneous construction of a constitutional provision, the legislature must first *act* with regard to the constitutional

---

[44] In *Evanhoff v. State Industrial Acc. Com.*, 78 Or 503, 521-22, 154 P 106 (1915), the Oregon Supreme Court quoted Judge Cooley on doctrines (1) and (2): "[W]here a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the Constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention. And where this has been given by officers in the discharge of their official duty, and rights have accrued in reliance upon it, which would be divested by a decision that the construction was erroneous, the argument ab inconvenienti is sometimes allowed to have very great weight." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rests Upon the Legislative Power of the States of the American Union* 67 (1868).

provision at issue. Generally, the legislature acts for purposes of this doctrine by enacting an implementing statute meant to carry into effect the substantive right guaranteed by the preexisting constitutional provision or a statute otherwise construing the constitutional provision. *See, e.g.*, *Thielke v. Albee*, 79 Or 48, 52, 153 P 793 (1916) (passage of a 1907 act by the legislature providing for carrying into effect the referendum powers reserved by the people in the state constitution, as well as the operating charters of numerous Oregon cities over the course of a nine-year period, are evidence of long-standing contemporaneous construction on which the people of Portland and numerous municipalities could rely); *State ex rel. Gladden v. Lonergan*, 201 Or 163, 177-79, 269 P2d 491 (1954) (citing *State v. Swain*, 147 Or 207, 214, 31 P2d 745 (1934) (1864 act by legislature enacting code of criminal procedure held to have constituted a legislative construction or definition of a constitutional provision adopted in 1857).

The court first notes that the Oregon Supreme Court on multiple occasions has called into question the utility of the doctrine of contemporaneous construction. *See State ex rel. Oregonian Pub. Co. v. Deiz*, 289 Or 277, 284, 613 P2d 23 (1980) ("Contemporaneous legislative actions should not necessarily be given much weight when construing constitutional principles."); *State of Oregon v. Kuhnhausen*, 201 Or 478, 517, 266 P2d 225 (1954) (determination of whether a trial is "speedy" for purpose of the constitutional provision is a judicial question and not within the powers of the legislature to contemporaneously define by statute); *State v. Harberts*, 331 Or 72, 89-90, 11 P3d 641 (2000) (legislature could not nullify through statutory construction the state's constitutional obligation under Article I, section 10, to bring an accused to trial without delay).

Even if the court were to rely on the doctrine of contemporaneous construction, its application is not appropriate to the facts of this case. In the 162 years since the Origination Clause was adopted, the legislature has never found occasion to pass a single statute implementing or interpreting its meaning. There is simply nothing to which the court could apply the doctrine. As to the Supermajority

Clause, the idea for the clause originated in the legislature. The court finds the legislative history of the referred resolution, HJR 14, truly "contemporaneous" and more persuasive than any later interpretation. *See DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, 260 n 7, 434 P3d 379 (2019) (suggesting that an implementing statute enacted by the same legislature that drafted Measure 50 and referred it to voters may provide context for understanding the constitutional text of Article XI, section 11, but that "[t]he wording adopted by the voters clearly controls any constitutional question"). In any event, taxpayers offer as examples only bills enacted more than 10 years after the Supermajority Clause. *See* HB 2922 (2007); HB 2698 (2009); HB 3115 (2009); HB 3164 (2009); HB 3309 (2009); HB 3372 (2013). Taxpayers correctly point out that each of these bills, like SB 1528, would have added back various items otherwise excluded or deducted from federal taxable income, and each includes a statement in its title that it is subject to the Supermajority Clause. *E.g.*, HB 3372 (2013) ("*Requires addition to taxable income* for Oregon tax purposes of amounts attributable to controlled foreign corporations and excluded from federal taxable income because of operation of certain federal law. \*\*\* Relating to tax treatment of income attributable to controlled foreign corporations; and *providing for revenue raising that requires approval by a three-fifths majority.*" (Emphases added.)). However, the court questions whether bills introduced more than 10 years later reflect any particular insight into the people's understanding of Measure 25 at the time of adoption in 1996 (much less their understanding of the Origination Clause). The Oregon Supreme Court has declined to consider the views of a later legislature as to the people's and the legislature's intentions some seven years earlier. *See Shilo Inn v. Multnomah County*, 333 Or 101, 134, 36 P3d 954 (2001), *modified on recons*, 334 Or 11, 45 P3d 107 (2002) ("The fact that the legislature that proposed Measure 50 to the people and enacted its implementing legislation might have held a different view does not inform our analysis of Measure 5 and, therefore, cannot dictate derivatively how we interpret Measure 50."); *see also* Suzanne L. Abram, Note, *Problems of Contemporaneous Construction in State Constitutional Interpretation,* 38 Brandeis LJ 613,

635 (2000) ("States sharply diverge, however, as to whether courts should give prior interpretations or subsequent interpretations weight if there is no interpretation of the constitutional provision at the moment of its adoption." (Emphases omitted.)).

The second of taxpayers' concepts relies on the "longstanding" nature of the legislature's interpretation of the Supermajority Clause. Taxpayers point out that the Office of Legislative Counsel advised Gary Wilhelms of the House Republican Office in 2011 that a telecommunications tax bill that would have broadened the base of the tax by "impos[ing] the tax on services not currently subject to the 9-1-1 tax" must satisfy the Origination and Supermajority Clauses. Letter from Dexter A. Johnson, Legislative Counsel Committee, to Gary Wilhelms at 2 (March 16, 2011). Taxpayers also cite the 2014 edition of the Office of Legislative Counsel's Drafting Manual, which stated that "[a] bill that repeals a tax credit, exemption or other tax benefit may be a bill for raising revenue if the primary purpose of the bill is to raise revenue for general government use. If the repeal is for another purpose, to eliminate an unused credit for example, the bill is not a bill for raising revenue." Legislative Counsel Committee, *Bill Drafting Manual* 192 (17th ed 2014) (internal footnote omitted). On the other hand, a memorandum from the Office of Legislative Counsel to Senator Ted Ferrioli dated February 1, 2016, describes the shift away from that view in light of the court's recent decision in *City of Seattle*. Memorandum from Dexter A. Johnson, Legislative Counsel Committee, to Sen Ted Ferrioli at 2-6 (Feb 1, 2016); *see also id.* at 7-8. Taxpayers cite the 2016 memorandum as an exhibit to the original complaint, and they cite no bills introduced after the Supreme Court's *City of Seattle* decision that include the supermajority language.

Taxpayers' examples clearly show that, before *City of Seattle*, the legislature's attorneys regularly advised that "addback" bills like SB 1532 were bills for raising revenue for purposes of the Supermajority Clause. The court finds this unsurprising and unpersuasive. Given the limited number of cases and other authorities interpreting either clause and the lack of an Oregon state court case determining whether a base-broadening bill is a bill for raising revenue,

the court presumes that the legislature's attorneys crafted their advice to help their client minimize the risk that a court would declare that a bill had violated either clause. The 2016 letter to Senator Ferroli changing this advice in light of *City of Seattle* illustrates this point. While the pre-*City of Seattle* advice may have been perfectly sound as a guideline to future conduct, it does not inform the court how to apply the law when a violation is alleged to have occurred.

Taxpayers' last contention, that this court should defer to the legislature's interpretation of the constitution to the same extent that courts defer to an administrative agency's interpretation of a statute, does not apply here. Taxpayers cite no authority supporting the legal principle for which taxpayers contend. Factually, in the case of the Origination Clause, there is nothing to which the court could defer because the legislature has not acted. In the case of the Supermajority Clause, the evidence of a legislative interpretation that taxpayers offer—bill language and legal advice—indicates that the legislature and its attorneys *changed* their interpretation after the Supreme Court issued its decision in *City of Seattle*. Again, there is no consistent legislative stance to which the court could defer.

## V.   CONCLUSION

Under the analytical framework that the Oregon Supreme Court has established in *Bobo* and applied in *City of Seattle*, SB 1528 is not "a bill for raising revenue" for purposes of the Origination or Supermajority Clauses. SB 1528 brings money into the treasury but lacks the essential features of a bill levying a tax because it changes the base of the personal income tax.

Now, therefore,

IT IS ORDERED that Defendant's Cross-Motion for Summary Judgment is granted; and

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment is denied.